IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

JANE DOE 1, an individual, and JANE DOE 2, )
an individual, )
 )
        Plaintiffs, )
 )
v. ) Case No. 2:19-CV-04229-BCW
 )
THE CURATORS OF THE UNIVERSITY OF )
MISSOURI, a body politic, ) **JURY TRIAL DEMANDED**
**Serve:**   Stephen J. Owens )
        Office of the General Counsel )
        227 University Hall )
        Columbia, Missouri 65211 )
 )
        Defendant. )

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs Jane Doe 1 ("Doe 1") and Jane Doe 2 ("Doe 2"), and for their First Amended Complaint against Defendant The Curators of the University of Missouri, hereby state as follows:

## INTRODUCTION

1. Throughout 2017, University of Missouri student and basketball recruit Terrance Phillips ("Phillips") – a known predator on campus – stalked and harassed Plaintiffs, ultimately culminating in the sexual assault of Doe 2.

2. The assault, harassment and stalking were reported to the University's Title IX Office. The University first ignored, and then later mishandled the investigation. Its failures resulted in Phillips being found to have no responsibility for most of his egregious conduct.

3. University officials, including the basketball staff and players, knew that Phillips was a danger to female students as early as the Fall of 2016. However, they did nothing to prevent his behavior and took no action against him in violation of the mandates of Title IX. To

date, Plaintiffs are aware of at least four (4) other complaints the University received regarding Phillips, two (2) of which predated Doe 2's complaints. Initially, the University did little to nothing regarding those complaints.

4. The University's failure to follow the dictates of Title IX and its own policies are well-documented. On February 14, 2019, *The St. Louis Post-Dispatch* reported that from 2015 to 2018 (the same years that Phillips was on campus) there were more than 3,000 allegations of misconduct reported to the Title IX Office. Disturbingly, for "the majority of those cases, an investigation wasn't completed, for a variety of reasons." In fact:

> "[In the 2017-2018 academic year], 46 cases were investigated out of 750 reports. Thirty-one of those cases did not advance after Title IX officials determined there was not sufficient evidence to go forward. The other 15 cases were evaluated by either a hearing panel or an administrator; 11 people were found responsible for violating university policy. Eight received a suspension from MU or the campus, two were kicked out of their residence halls and two were put on disciplinary probation. But no one was permanently expelled last year, according to the report."

5. Phillips' harassment and assault of Plaintiffs (and other University students, for that matter) could have been prevented if the University had taken appropriate action and followed the guidelines established by Title IX and its own policies.

## JURISDICTION AND VENUE

6. This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 because the claims arise under 20 U.S.C. §1681, which constitutes Title IX of the Educational Amendments of 1972.

7. Venue in the Western District of Missouri is appropriate pursuant to 28 U.S.C. §1391 because the occurrences complained of took place in Columbia, Missouri, and the Plaintiffs resided within the Western District of Missouri during the time of the occurrences.

## PARTIES

8. Plaintiffs are women who at all times relevant to this Complaint were students of the University of Missouri and residents of Columbia, Missouri.

9. Defendant The Curators of the University of Missouri is a body politic created under the Constitution and laws of the State of Missouri. Pursuant to R.S.Mo. §172.020, the University has the "power to sue and be sued, complain and defend in all courts." At all times relevant herein, Defendant operated and operates the campus of the University of Missouri located in Columbia, Missouri, with its principal place of business located in Columbia, Missouri.

## FACTUAL BACKGROUND

10. In the fall of 2015, Phillips, a top basketball recruit, moved to Columbia, Missouri to begin his freshman year. Before he even stepped foot on the campus, he was touted as a leader of the team with a charismatic personality and top basketball skills.

11. By the end of his freshman year, Phillips had displayed erratic, volatile and aggressive behavior. Rumors swirled around campus that Phillips was mistreating, harassing and stalking multiple women.

12. Phillips' violent behavior continued to escalate. In the fall of 2016, Phillips began assaulting a female student and fellow classmate. Despite her fear of retaliation, she eventually filed a Title IX complaint against Phillips for this abuse. She provided the University's Title IX Office with photos of her bruises, aggressive text messages from Phillips, screenshots of Phillips' tweets discussing the abuse, and emails from Phillips in which he apologized for the abuse he inflicted on her.

13. After meeting with the Title IX Office, she later informed the Title IX Office that she was afraid to involve herself in the investigation. Specifically, she was petrified of retaliation

and the trauma associated with going public. Therefore, she told the Title IX Office that she did not want to go forward. Pursuant to the University's Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/Employment Policy (the "University's Policy"), the University could have pursued its own investigation into Phillips based upon the complaint it received. It did not.

14. Specifically, Chapter 600.020 E.2. of the University's Policy plainly states:

> "If, after due deliberation and based on the nature and severity of the Complaint, the Title IX Coordinator determines there is a sufficient basis to proceed with the Complaint, the Title IX Coordinator may initiate an investigation notwithstanding a Complainant's request that the Complaint not be pursued. Such a decision should be well-reasoned and documented."

15. The University ignored the photographic and documentary evidence of violence and instead chose to turn a blind eye to the obvious misconduct.

16. The Title IX Office chose not to pursue this claim despite the overwhelming amount of evidence against Phillips, involving numerous complaints against Phillips regarding his aggressive and inappropriate behavior. While it was well within its authority to investigate these complaints, the Title IX Office stood idly by.

## DOE 1

17. In April of 2017, Phillips focused on a new victim. Doe 1 was a full-time student at the University of Missouri who also worked part-time at 10 Below, a popular bar in Columbia.

18. Because of the bar's popularity, the men's basketball team would often hold recruiting events there and many of the players would attend.

19. On April 8, 2017, at one of these University events, Doe 1 met Phillips for the first time. They exchanged numbers but went their separate ways that evening.

20. On April 11, 2017, just three days later, Doe 1 was beginning to sense that something was wrong with Phillips. He sent her a barrage of long text messages proclaiming his feelings for her. He even sent a picture of his genitalia. Shocked, Doe 1 explained that she was offended and tried to cut off communications. Phillips was undeterred and continued to pursue her.

21. By April 14, 2017, not even a week after Doe 1 first met Phillips, he began showing up outside of her classes, at her place of employment, and outside of her home. When Doe 1 was working, he would appear in the bar. When she was on a break, he would appear in the break room. Ultimately, Phillips even got a job at the bar where Doe 1 worked.

22. Doe 1 told many people that she was terrified of Phillips. On several occasions, Doe 1 saw Phillips outside of her house at odd hours in the middle of the night. He would also wait for her outside her place of employment. In a last-ditch effort, Doe 1 approached his teammates and asked them to talk to Phillips to get him to leave her alone. Surprisingly, his teammates told her that they were aware of his behavior but that "[Phillips] is just like that with girls."

23. As a result of Phillips' behavior toward Doe 1, he was reported to the Title IX Office. On September 12, 2017, Doe 1 was contacted by Ross Brown ("Brown"), Equity Consultant and Investigator from the University's Title IX Office, to set up a meeting regarding her claim.

24. During that meeting, Doe 1 explained that a student was stalking and harassing her. Like previous victims, she explained that the student was a basketball player, but refused to provide the Title IX Office with Phillips' name for fear of retaliation.

- 5 -
Case 2:19-cv-04229-BCW   Document 5   Filed 01/22/20   Page 5 of 17

25. On October 6, 2017, Doe 1 received an email from Brown confirming that the Title IX Office had received multiple reports regarding Phillips. Brown explained that because of these reports the Title IX Office "may have to proceed with an investigation into him." Notably, Doe 1 never disclosed Phillips' name to the Title IX Office. Instead, the office was able to identify Phillips based on the pattern of his behavior.

26. Instead, the Title IX Office chose to do nothing, letting Phillips continue to prey on other women. In addition, the Title IX Office gave Doe 1 no support and little was communicated about the process and what to expect. The University also did not issue a No Contact directive against Phillips and did not put in place any remedial or protective measures. This was contrary to the University's Policy requirement that if the University chooses not to go forward with an investigation, the Title IX Coordinator should consider steps to "limit the effects of the harassment and prevent its recurrence, and remedy its effects on the victim and the University community." University Policy, Section E.2. In the meantime, Phillips continued to stalk and harass Doe 1.

27. Eventually, Doe 1 was forced to drop out of school just shy of graduation because she feared for her safety.

## DOE 2

28. Buoyed by the lack of any consequences for his actions, Phillips remained on the basketball team, worked at the most popular bar in town, and continued going to classes.

29. Therefore, when Phillips asked to "follow" Doe 2, another full-time student at the University, on social media, she had no reason to suspect that the request could be ill-intended or that she needed to avoid Phillips. The two began chatting.

30. Just as with Doe 1 and the other victims, once contact was initiated, Phillips aggressively pursued Doe 2.

31. On December 5, 2017, Doe 2 and a friend went with Phillips to Willie's Bar, his place of employment. Phillips made drinks for both girls.

32. Upon information and belief, the drinks were laced with a drug.

33. After consuming the drink Phillips made for her, Doe 2's next memory was Phillips videotaping her with his phone as he raped her.

34. Doe 2 did not consent and was in fact, unable to consent, to sexual intercourse.

35. While raping her, Phillips sent Doe 2's roommate numerous Snapchat messages asking her to join them for a "threesome".

### DOE 2 REPORTS THE SEXUAL ASSAULT TO THE TITLE IX OFFICE, WHICH FINALLY DECIDES TO PURSUE ACTION AGAINST PHILLIPS

36. On December 8, 2017, Doe 2 went home to St. Louis to tell her parents that she had been raped.

37. On December 11, 2017, Doe 2 and her father returned to Columbia, Missouri and made a complaint with the Columbia Police Department. They also filed a written report with the University's Title IX Office.

38. Doe 2 requested that the Title IX Office proceed with its investigation. Doe 2 and her father were assured that the Office would fully investigate the allegations and that a "No Contact" directive would be sent to Phillips immediately.

39. On December 14, 2017, Doe 2 contacted Diamond Scott ("Scott"), who was then in charge of her investigation at the University. Doe 2 explained that she was not mentally ready to proceed with the investigation and needed some time to concentrate on her own health.

40. Scott assured Doe 2 that there was no time limit for the investigation and that she would "check back in" with Doe 2 in a few months to see if she was ready to proceed with the charges.

41. Then, on January 4, 2018, the Title IX Office informed Doe 2 that they were going to move forward with the investigation regardless of whether or not she wanted to proceed with it.

42. There was little communication with Doe 2 regarding the investigation.

43. Meanwhile, on December 18, 2017, the Title IX Office contacted Doe 1 and informed her that they would be going forward with a formal investigation into her complaint against Phillips, as well.

44. Plaintiffs were then informed that there were at least four (4) complaints against Phillips at the time.[1] It is unclear why the University did not act under Section E of the University's Policy until receiving its fourth complaint against Phillips, who was clearly a threat to the University community.

## THE "INVESTIGATION"

45. The Plaintiffs were promised that the University was going to perform a thorough investigation into all of Phillips' victim's allegations, including talking to witnesses and gathering evidence. The University also represented that all of the complaints would be presented to the Title IX panel together in one hearing.

46. This was not the case.

47. A Title IX investigator is required to give certain notices to the Parties within ten business days of the formal investigation identifying the nature of the allegations, and is to make

---

[1] Two (2) additional women came forward and disclosed that they had similar experiences with Phillips after the University publicly announced that is was opening an investigation.

"reasonable efforts" to interview all of the parties' relevant witnesses, obtain available information, and provide a written report to the Title IX Coordinator. University's Policy, Section K. Moreover, an investigation into a Title IX complaint should be "completed expeditiously." University's Policy, Section K. This is defined as "normally within thirty (30) business days" of the decision to pursue a formal investigation. *Id.*

48. The Title IX Office should also make efforts to communicate with the parties to explain the status of the investigation.

49. Here, however, the Title IX Office provided little communication to Plaintiffs during the five to six months between the time they were told that the University would be pursuing the complaint process and the date of the hearing.

50. Though the Title IX Office told Plaintiffs that they had done a number of interviews, it now appears that the investigator did limited interviews, did not speak to most (if any) of the witnesses identified by Plaintiffs, never attempted to retrieve surveillance from the dates of the incidents, never re-interviewed Plaintiffs, and did very little follow-up or investigation, leaving the investigation far from complete.

51. In addition, rather than complete the investigation "expeditiously" or within "thirty business days" of the decision to pursue a formal investigation, it took many ***months*** for the University to do what little investigation it did.

52. Despite the lack of investigation, Plaintiffs were assured by the Title IX Office that the case against Phillips was "airtight" because of all of the complaints against him.

## THE "HEARING"

53. On May 22, 2018, *eight months* after Doe 1 was stalked and harassed by Phillips, Doe 1 was told that her hearing would occur two days later. The requirement of giving fourteen business days notice to a complaining party was ignored.

54. Also on May 22, 2018, *five months* after Doe 2 was raped by Phillips, the University told Doe 2 that her hearing would occur three days later. The notice requirement was ignored for Doe 2 as well.

55. The next day, Scott attempted to explain to Doe 2 her rights relating to the hearing; she provided incorrect information. Scott explained to Doe 2 the rights of a Complainant, which included that she would be able to appear at the hearing with an advisor, ask questions of Phillips and be present for the entirety of the hearing.

56. Later that day, however, Scott contacted Doe 2 again and told Doe 2 (for the first time) that she was not the Complainant in the case but merely a witness. Therefore, she would not be afforded any of the privileges that Scott had previously explained.

57. Plaintiffs were not only refused Complainant rights at the last minute, they were refused the usual "victim" rights of having an Advisor present while giving devastating and emotional testimony. In sum, they were left alone in a room where Phillips would be given support and rights.

58. The University then underplayed the importance of having Plaintiffs appearing at the hearing. Rather than encouraging Plaintiffs to attend the hearing to testify, it seemed as though they were discouraged. For example, Doe 1 was told that her attendance "wasn't necessary" and that they "already had her statement." As such, Doe 1 did not attend the hearing.

59. In violation of the dictates of Title IX, Plaintiffs did not know the contents of the investigative report, who was interviewed, and what evidence was presented during the hearing.

60. It is also Plaintiffs' understanding that each of the complaints were treated as "separate" complaints, such that each hearing panel could not and/or did not hear the numerous complaints against Phillips. Each victim was on their own and the hearing panels were not given full information regarding Phillips' numerous violations.

## THE DECISION

61. On June 6, 2018, nearly two hundred days after the sexual assault, Doe 2 was contacted by the University and told that the panel found Phillips "not responsible" for sexually assaulting her. The University also informed Doe 2 for the first time that the panel only heard evidence of Doe 2's assault and did not hear about the other complaints.

62. The next day, Doe 1 was contacted by the University and told that Phillips was only found responsible for sending her the picture of his genitalia, but not for stalking her.

63. No written determination was provided to Plaintiffs and they were not given reasons for the findings, as Complainants are entitled to receive.

64. Following the decision, counsel for Doe 2 requested the investigative file and the hearing transcripts and/or hearing recording from the University. After weeks of resistance and waiting, Doe 2 was shocked to learn that virtually no evidence was presented at the hearing. In fact, a panel member asked the University why they did not interview one of Doe 2's key witnesses, her roommate. The University representative responded: "Due to the nature of the

investigation being fairly public, we were keeping it on a need to know basis and didn't extend that any further than it needed to be."[2]

65. Originally, Scott told Doe 2 that she could appeal the decision, but after receiving the oral determination, Scott told her that she could not appeal because she was not the Complainant.

66. On November 15, 2018, Phillips utilized social media to publicly shame all the victims who came forward against him. Phillips most recently posted: "[Doe 2] you can go fuck yourself."

67. In the face of numerous egregious allegations against one of its star athletes, the University decided to do nothing. Once the University finally acted, it conducted an "investigation" that was counter to its policies and federal law. As a result, rather than feeling safe, the University's decisions further victimized and traumatized Doe 1 and Doe 2.

### THE UNIVERSITY DID NOT EXPLAIN HOW PLAINTIFFS' RIGHTS WOULD BE JEOPARDIZED BY NOT BEING DEEMED A "COMPLAINANT" AND INCONSISTENTLY APPLIED ITS POLICIES TO PLAINTIFFS

68. Neither Doe 1 nor Doe 2 was told that the University had unilaterally decided to proceed as the Complainant, nor was it explained what impact that decision would have on the process for the Plaintiffs and how their rights under Title IX and the University's Policy would be jeopardized.

69. For example, under the University's Policy, the Complainant is given certain rights, including but not limited to the following:

    (a) To request a no contact directive between the Parties;

---

[2] This explanation simply makes no sense. By definition, a witness is someone who has seen an event or crime that has taken place. Doe 2's witnesses *knew* about the allegations and should have been called. Also, this case was highly publicized after Phillips' removal from the basketball team.

(b) To have an Advisor of the Complainant's choice accompany the Complainant to all interviews, meetings and proceedings;

(c) To have an opportunity to present a list of potential witnesses and provide evidence to the Investigator;

(d) To be informed of the finding, rationale, sanctions and remedial actions in writing;

(e) To have an opportunity to appeal the findings and sanctions;

(f) To have the right to object to hearing panelists; and

(g) Additional rights relating to the hearing, including (i) the right to receive notice of the hearing (at least 14 business days prior to the hearing or as far in advance as reasonably possible if an accelerated resolution process is scheduled with consent of the Parties), (ii) to have the names of witnesses that may participate in the hearing and copies of all pertinent documentary evidence and investigative report at least 5 days before the hearing, (iii) to be present at the hearing, (iv) to request alternative attendance or questioning at the hearing, (v) to have an Advisor present at the hearing, (vi) to testify at the hearing, (vii) to present witnesses and documents, and (viii) to question witnesses.

University's Policy, Section H and Section P(3), (4), (5) and (10).

70. The University's Title IX Office seemingly treated Plaintiffs initially as Complainants, providing a no contact directive for Doe 2, asking for a list of witnesses and evidence, and providing certain notices and updates to Plaintiffs, among other things.

71. Plaintiffs were also told that they would have a right to appeal the determination, if necessary, and attend the entirety of the hearings with advisors.

72. However, the day before the hearing the University informed Doe 2 – in extreme prejudice to her rights – that she could only be present during her testimony during the hearing. She was not allowed to call witnesses, ask questions, be present during the remaining hearing, or file an appeal, in violation of Title IX.

73. The University inconsistently applied its Policy to the Plaintiffs, seemingly unaware of how to treat them as non-Complainants and giving them misinformation as a result that prejudiced their rights.

**COUNT I**
**Violation of Title IX**
**(20 U.S.C. §1681, et seq.)**
**(Deliberate Indifference to Sexual Harassment)**

74. All paragraphs above are incorporated herein by this reference.

75. The University had actual knowledge of the harassment and abuse sustained by Plaintiffs at the hand of Phillips, a student and star basketball player at the University.

76. The Title IX violations were reported to the University's Title IX Office who had the direct power and authority to address the harassing conduct and institute corrective measures on the University's behalf.

77. The University exercised substantial control over Phillips in that he was under the University's disciplinary authority. At all times relevant to this Complaint, Phillips was a student at the University and a member of its basketball team.

78. Despite having knowledge of the abuse and harassment, the University displayed a deliberate indifference in responding to the knowledge of Phillips' conduct. Such indifference was clearly unreasonable.

79. The University's failure to timely pursue any action against Phillips made Plaintiffs vulnerable to Plaintiff's harassment and sexual assault.

80. The sex-based harassment articulated above was so severe, pervasive, and objectively offensive that it deprived Doe 1 and Doe 2 of their access to educational opportunities or benefits provided by the University such that their conditions of education changed and created an abusive educational environment.

81. The University's conduct also denied the Plaintiffs equal access to the Title IX protections and process.

82. In fact, both Plaintiffs left the University because of the trauma sustained by Phillips and the University's treatment of them.

83. The University received federal financial assistance and therefore is required to follow the mandates of Title IX.

84. The University created and/or subjected Plaintiffs to a hostile educational environment in violation of Title IX by, among other things (a) failing to follow its own Policies and procedures in place under Title IX; (b) failing to adequately and properly investigate allegations of sexual harassment, stalking and sexual assault perpetuated upon the Plaintiffs; (c) failing to adequately and properly follow proper procedures in holding the hearing; (d) depriving Plaintiffs with complainant and victim rights, as set forth above; (e) failing to properly and promptly respond to the complaints of Title IX sex-based discrimination; (f) failing to protect Plaintiffs from sex-based discrimination; (g) failing to correct known harassment; and (h) failing to apply its Policy consistently to Plaintiffs, as victims of sexual assault, sexual harassment, and stalking, among other things.

85. The University engaged in a pattern and practice of behavior designed to discourage and dissuade students who had been sexually assaulted from seeking adequate prosecution and protection.

86. Plaintiffs have suffered emotional distress and psychological damage, and their character and standing in the community have suffered from the harassment fostered as a direct and proximate result of the University's deliberate indifference of their rights under Title IX.

**WHEREFORE**, Plaintiffs pray for a judgment in their favor and against Defendant The Curators of the University of Missouri, as follows:

A. Compensatory damages in an amount to be determined at trial;

B. Punitive damages;

C. Injunctive relief requiring the University to (a) take effective steps to prevent sex-based discrimination and harassment, including sexual assault, in its education programs; (b) fully investigate conduct that may constitute sex-based harassment and/or sexual assault; (c) appropriately respond to all conduct that may constitute sex-based harassment and/or sexual assault; (d) treat all victims as complainants and provide such victims with "complainant" rights under Title IX and the University's Policy, regardless of whether the victims want to remain anonymous or pursue a formal investigation; and (e) mitigate the effects of harassment and/or assault including by eliminating any hostile environment that may arise from or contribute to it;

D. Plaintiffs' attorneys' fees and costs; and

E. For such other relief as the Court deems proper.

Respectfully submitted,

CARMODY MacDONALD P.C.

By:    */s/ Gerard T. Carmody*
      Gerard T. Carmody, #24769MO
      Ryann C. Carmody, #56831MO
      Candace E. Johnson, #70152MO
      120 South Central Avenue, Suite 1800
      St. Louis, Missouri 63105
      (314) 854-8600 Telephone
      (314) 854-8660 Facsimile
      gtc@carmodymacdonald.com
      rcc@carmodymacdonald.com
      cej@carmodymacdonald.com

Attorneys for Plaintiffs Jane Doe 1 and Jane Doe 2

- 17 -
Case 2:19-cv-04229-BCW   Document 5   Filed 01/22/20   Page 17 of 17