UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| JANE DOE 1, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-04229-NKL |
| | ) | |
| THE CURATORS OF THE | ) | |
| UNIVERSITY OF MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTIONS *IN LIMINE*

Defendant The Curators of the University of Missouri ("University"), by and through its attorneys TUETH KEENEY COOPER MOHAN & JACKSTADT P.C., and in compliance with this Court's Pre-trial Orders, provides the following Motions *in Limine*:[1]

## INTRODUCTION

Plaintiffs, two former female students at the University, allege that TP, a former male student at the University, engaged in sex-based misconduct towards them at off-campus locations. When the University was notified of Plaintiffs' concerns regarding TP, University personnel in its Office for Civil Rights and Title IX ("Title IX Office") took immediate and sustained actions to respond to Plaintiffs' concerns. For instance, Title IX Office staff immediately (and thereafter repeatedly) communicated with Plaintiffs about their concerns,

---

[1] The University has filed dispositive motions demonstrating, we respectfully submit, that it is entitled to summary judgment on all Counts and claims. This Court has not yet ruled on the University's dispositive motions. Submitting these motions *in limine* is not in any way a waiver or acknowledgement that there are material issues of fact that should be submitted to a jury. To the contrary, we respectfully submit that the opposite is true and we believe that these motions bolster the University's dispositive motions because the evidence upon which Plaintiffs rely is inadmissible for the reasons discussed herein.

1

provided resources to Plaintiffs, conducted investigations, issued TP an interim suspension from campus and all athletic activities, initiated internal University Title IX proceedings, held multiple hearings relating to TP's alleged misconduct, and took discipline against TP consistent with the determinations by the University hearing panels. Plaintiffs had no additional interactions with TP on campus after the University was notified of Plaintiffs' concerns. Plaintiffs had the opportunity to continue to attend classes without further contact with TP.

Plaintiffs brings this action seeking money damages against the University under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). Doc. 75. Title IX prohibits discrimination in the provision of educational services and programs "on the basis of sex." *Id*. Plaintiffs must prove, among other things, that the University "exercise[d] substantial control over both the harasser and the context in which the known harassment occurs." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ*., 526 U.S. 629, 645 (1999).

Title IX was enacted pursuant to the Constitution's Spending Clause and does not contain an explicit private right of action for money damages. Nonetheless, in *Davis*, the Supreme Court, constrained by the Spending Clause, recognized a narrowly limited private right of action for damages where a recipient of federal funds is "deliberately indifferent" to "actual notice" of ongoing sex-based misconduct by a student towards another student under circumstances over which the recipient had "substantial control." This case falls squarely under the *Davis* demanding standard of liability in that Plaintiffs' Title IX claims emanate from alleged student-on-student gender-based misconduct. The *Davis* Court's actual notice and deliberate indifference standard of liability creates one of the highest bars in civil litigation.

It is important to recall when reviewing these motions in *limine* that the *Davis* Court explicitly rejected the notion that alleged victims of peer-on-peer discrimination have a right

under Title IX to make "particular remedial demands," and held that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id*. at 648-649. The Court held that school administrators continue to enjoy the "flexibility they require" and are not liable unless their response is "clearly unreasonable" – an issue that is resolvable on a "motion to dismiss, for summary judgment, or for a directed verdict." *Id*. The Eighth Circuit has succinctly held that "dissatisfaction with [a] school's response does not mean the school's response can be characterized as deliberate indifference." *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019). Nonetheless, these are the very sorts of grievances to which Plaintiffs devote most of their 171-paragraph, 34-page Second Amended Complaint. Doc. 75. Plaintiffs' claims about how the University may have handled its processes differently, or how different outcomes might have been achieved, is irrelevant, unduly prejudicial, and speculation.

Pursuant to *Davis*' stringent liability standard, Plaintiffs should be precluded from introducing any evidence that will not assist the jury in determining whether or not relevant University Title IX office personnel were "**deliberately indifferent**" to "**actual notice**" of sex-based misconduct by TP towards Plaintiffs, under circumstances over which the University had **"substantial control**." In other words, Plaintiffs should not be permitted to present evidence that "second guesses" the relevant Title IX Office personnel's response throughout the investigation or hearing process. Furthermore, Plaintiffs should be precluded from introducing evidence related to any complaints or reports that the University did not have actual notice of *prior to* receiving Plaintiffs' reports in December 2017. Relatedly, any evidence of allegations over which the University had no control should be excluded from the trial.

Additionally, Plaintiffs are unable to recover damages in this case and should be precluded from introducing evidence of ***any*** type of damages. This is for multiple reasons,

including their failure to timely disclose such damages as required by FRCP Rule 26, the preclusion of punitive and emotional distress damages by the Supreme Court's decision in *Cumming v. Premier Rehab v. Keller, P.L.L.C.*, 142 S.Ct. 1562 (2022), and the unavailability of other alleged compensatory and nominal damages.

Defendant therefore requests that the Court prohibit Plaintiffs, Plaintiffs' counsel, and Plaintiffs' witnesses from mentioning to members of the jury, soliciting testimony, introducing exhibits, or arguing before the jury, any matters pertaining to the following topics.

**Part One:**

**<u>Evidence Pertaining to Plaintiffs' Liability Claims</u>**

The Federal Rules of Evidence provide that all "relevant evidence" is admissible, unless otherwise prohibited. *See* FRE 402. The trial court has broad discretion in deciding whether to admit evidence at trial. *See Fortune Funding LLC v. Ceridian Corp.,* 368 F.3d 985, 990 (8th Cir. 2004). Relevant evidence "has any tendency to make a fact more or less probable than it would be without the evidence" and involves a "fact [that] is of consequence in determining the action." FRE 401. *Vogt v. State Farm Life Ins. Co*., 963 F.3d 753, 772 (8th Cir. 2020).

Under FRE 403, if the probative nature of evidence is outweighed by the prejudicial effect the evidence will have, it is inadmissible. "A trial judge can and should exclude evidence when convinced that it will create a danger of prejudice outweighing its probative value. *E. I. DuPont DeNemours v. Berkley & Co., Inc*., 620 F.2d 1247, 1272 (8th Cir. 1980). Relevant evidence may also be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, wasting time, or being cumulative of other evidence. FRE 403.

4

1. **EVIDENCE REGARDING STATEMENTS ABOUT ALLEGED DISCRIMINATION BY TP NOT MADE BY OR GIVEN TO RELEVANT UNIVERSITY PERSONNEL.**

In order to prevail on their Title IX claims, Plaintiffs must establish that the University was: (1) deliberately indifferent, (2) to **_known_** acts of discrimination, (3) which occurred under its control. *Shank v. Carleton College*, 993 F.3d 567, 573 (8th Cir. 2021). Actual, not constructive, notice is a requirement to impose Title IX liability. *See Davis*, 526 U.S. at 650 (holding that "actual knowledge" of severe, pervasive, and objectively offense sexual harassment is required to establish liability).

In order for "actual notice" to be relevant, it must have been made to a person at the University in a position to remedy the alleged discrimination. In *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), the Court described this stringent requirement:

> Because the express remedial scheme under Title IX is predicated upon notice to an "appropriate person" and an opportunity to rectify any violation, 20 U.S.C. § 1682, we conclude, in the absence of further direction from Congress, that the implied damages remedy should be fashioned along the same lines. An "appropriate person" under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

*Id*. at 290.  Of course, this stringent requirement has been followed by the Eighth Circuit.[2]  In this context, even *a recipient's* knowledge of "rumors" is irrelevant and does not place federal

---

[2] *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 456–59 (8th Cir. 2009) ("Plamp has failed to establish that the guidance counselor, Thiesse, was an appropriate person with authority to institute corrective measures. . . There was no evidence that Theisse had the power to stop or prevent the harassment from occurring by taking actions such as suspending Tate from teaching, curtailing his teaching or other school-related privileges, requiring him to attend sessions or meetings about his behavior, or ensuring that he was under greater supervision. . . Title IX does not contemplate a definition of "corrective measures" so broad as to include the mere ability to report suspicions of discriminatory conduct to someone with the authority to stop the abuse or

funding recipients on actual notice of gender discrimination for the purposes of Title IX. *Kelly v. Kluck*, 249 F.3d 773, 780 (8th Cir. 2001) ("[I]t is undisputed that [institution] did not have any actual knowledge of the extent of Kluck's misconduct; it was aware of rumors, investigations, and student statements, but did not possess any conclusive proof that Kluck actually molested students while employed at [institution]."). Put succinctly, actual notice of actual discrimination, not rumors or innuendo, must have been given to a person working for the recipient of federal funds who was in a position to remedy the discrimination in order for the notice element to be satisfied.

We anticipate Plaintiffs will attempt to introduce evidence related to alleged statements to or from non-relevant individuals affiliated with the University (for example, statements by or to other students, and statements by or to other non-relevant persons) regarding TP. Specifically, in their Second Amended Complaint, Plaintiffs allege that rumors "swirled" around campus that TP was "mistreating, harassing, and stalking multiple women." Doc 75, ¶ 12. Plaintiffs allege that TP had a reputation for being problematic, asserting that he was a "known predator." Doc. 75, ¶ 1. Additionally, Doe 1 alleges that she approached TP's teammates to ask them to convince TP to leave her alone, and they responded to her that TP was "just like that with girls." *Id.* at ¶ 27. There is **no** evidence that these rumors were reported to relevant Title IX Office personnel but

---

control the harasser. Such an approach would expand the scope of Title IX liability beyond that which Congress intended and would functionally open all educational institutions to liability based on a theory of respondeat superior or constructive notice—a move that the Supreme Court has clearly stated the statute does not contemplate."). *See also Podrebarac v. Minot State Univ.*, 835 F. App'x 163, 164 (8th Cir. 2021) ("The second element, "actual knowledge," is missing here. *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058–59 (8th Cir. 2017). It is undisputed that Podrebarac did not tell anyone in a position of authority at Minot State about her relationship with Boren until her attorney notified the school in 2013, nearly a year after she graduated. . . . '[A]fter-the-fact notice,' as we have already made clear, is not enough. *K.T.*, 865 F.3d at 1058–59.").

the implication Plaintiffs try to paint is clear: that somehow the University should have gleaned that TP was dangerous. But Title IX requires proof of "actual notice" to persons in a position to remedy alleged discrimination (here, Title IX office personnel) – not proof that a recipient should have known about alleged discrimination. Title IX is not a negligence statute.

### A. Rumor mill and other evidence about statements by or to non-relevant University personnel is irrelevant.

As a result, statements *to* persons not in a position to remedy the alleged discrimination by TP – such as Plaintiffs, other students, and University employees outside of the Title IX office – are not relevant to demonstrating the University had actual notice of discrimination under Title IX and should be excluded. Similarly, statements *from* others about TP that were not reported to relevant University personnel in a position to remedy alleged discrimination are irrelevant under Title IX and should be excluded. FRE 401(a).

### B. Rumor mill evidence and other out of court statements are hearsay.

Also, out of court statements attributed to other students, or to non-relevant University persons, about TP are classic hearsay and must be excluded for this reason as well. Any alleged evidence of what persons other than relevant University Title IX personnel supposedly said about TP is inadmissible hearsay. FRE 801 and 802.

### C. Rumor mill evidence and other statements to non-relevant University persons is prejudicial and likely to confuse the jury.

Any purported evidence about statements by or to non-relevant University personnel about TP is also inadmissible because it is highly prejudicial and likely to confuse the jury. FRE 403. "Unfairly prejudicial evidence has also been described as evidence that is so inflammatory on its face as to divert the jury's attention from the material issues in the trial." *Barclay v. Mercy Health Servs.-Iowa Corp.*, No. C 07-4074-MWB, 2009 WL 2462296, at *3 (N.D. Iowa Aug. 12,

2009) (quoting *United States v. Adams*, 401 F.3d 886, 900 (8th Cir. 2005)). Evidence is unfairly prejudicial if it is "misleading" or it "confus[es] the jurors" and if, "attempting to clarify the confusion would rapidly devolve into a 'trial within a trial.'" *Lee v. Small*, 829 F. Supp. 2d 728, 751 (N.D. Iowa 2011) (quoting FRE 403; quoting *Chism v. CNH America, LLC*, 638 F.3d 637, 642 (8th Cir. 2011) (upholding exclusion of evidence that could "raise extraneous controversial issues, confuse the issues, and be more prejudicial than probative" and permitting a district court to "choose to avoid a trial within a trial").[3]

For all these reasons, Plaintiffs and their counsel should be precluded from commenting about, making argument, or seeking to introduce evidence of statements of non-relevant University personnel about TP's alleged misconduct.

## 2. AFTER-THE-FACT EVIDENCE REGARDING TP'S ALLEGED GENDER DISCRIMINATION.

The University Title IX personnel first learned of any alleged interactions between Plaintiff Doe 1 and TP in September of 2017. Doc 75, ¶ 28. University Title IX personnel first learned of any alleged interactions between TP and Plaintiff Doe 2 in December 2017. Doc 75, ¶ 41. The University nonetheless anticipates Plaintiffs will attempt to introduce evidence of other reports Title IX personnel received regarding TP *after* Doe 2's report in December 2017 including allegations from other individuals about TP. Such evidence is irrelevant to proving that

---

[3] Numerous courts have excluded rumors, innuendo, and other statements about alleged misconduct under Rule 403. *See, e.g.*, *Scott v. City of Sioux City*, 96 F. Supp. 3d 876, 984 (N.D. Iowa 2015) (attempts to introduce this type of evidence is "keeping with what appears to be [Plaintiff's] intention to build a case on negative innuendo. Such evidence also has a very substantial potential for unfair prejudice, because it would misdirect the jurors, enflame their passions in response to behavior of others that has little relevance to [Plaintiff's] claims, and cause jurors to decide the case on the basis of their emotional response to the conduct described in the statements at issue"); *Stephens v. Rheem Manufacturing*, 220 F.3d 882, 885 (8th Cir. 2000) (excluding "salacious rumor-based evidence" because it "could have unduly prejudiced the jury against [Defendant], and that this danger of prejudice greatly outweighed the limited probative value of the evidence").

relevant University personnel had actual notice of alleged discrimination prior to notice of concerns by Plaintiffs, and the evidence is highly prejudicial and likely to confuse and mislead the jury.

### A.      "After-the-fact" statements to Title IX personnel are irrelevant.

As noted above, Plaintiffs must show that relevant University personnel had actual notice of TP's alleged gender-based discrimination *before* the alleged discrimination against Plaintiffs to establish Title IX liability.  Any reports the University's Title IX personnel received after Doe 2's report in December 2017 regarding TP are "after-the-fact" reports and are irrelevant to establish the essential element required in this case—whether the University had ***prior actual notice*** of TP's alleged discrimination.

Information acquired by Title IX personnel *after* Title IX personnel became aware of Plaintiffs' concerns is not relevant to any inquiry in this case.  FRE 401 and 402.  Courts do *not* permit evidence of alleged discrimination that the recipient receives "after-the-fact." *K.T. v. Culver-Stockton College*, 865 F.3d 1054, 1058 (8th Cir. 2017) ("[t]he actual knowledge element requires schools to have more than after-the-fact notice"). Courts permit evidence of prior misconduct in Title IX cases *only* when it demonstrates the recipient had *actual notice* of gender discrimination prior to the alleged discrimination against the plaintiff. *See K.T. v. Culver-Stockton College*, 865 F.3d 1054, 1058 (8th Cir. 2017) (a plaintiff must prove that the institution had "***prior notice*** of a substantial risk of peer harassment . . .) (emphasis added). Similarly, "[e]vidence of harassment ***after*** the alleged harassment of the plaintiff, or of which the plaintiff was not aware, or that is simply too distant in time or unrelated to the harassment of the plaintiff is not relevant to show that the plaintiff was harassed or believed that she was harassed."

*Barclay*, 2009 WL 2462296, at *5 (emphasis added) (citing *Williams v. City of Kansas City*, 223 F.3d 749, 755 (8th Cir. 2000)).[4]

"After-the-fact" reports to the University's Title IX office about TP are irrelevant and should be excluded.

### B. After-the-fact reports/statements are prejudicial and misleading.

Any reports or statements made to relevant University personnel concerning TP after December 2017 are also highly prejudicial and likely to confuse the jury. FRE 403. *See also Langenbau*, 167 F. Supp. 3d at 992 ("Unfairly prejudicial evidence, inviting a decision on an improper basis, includes evidence that is so inflammatory on its face as to divert the jury's attention from the material issues in the trial.") (quoting U.*S. v. Adams*, 401 F.3d 886, 900 (8th Cir. 2005).

Plaintiffs' attempt to use allegations regarding TP provided to the Title IX Office after December 2017 (the time of Doe 2's report) are clearly inadmissible under FRE 403. Allegations from additional persons after December of 2017 have no bearing on whether the University was deliberately indifferent to *Plaintiffs'* concerns. This is the precisely the kind of irrelevant, misleading, and prejudicial evidence that FRE 403 excludes.

After-the-fact evidence, including witness testimony, documents, argument, and statements to the jury, should be excluded.

---

[4] *See also Fullwiley v. Union Pac. Corp.*, 273 Fed. App'x. 710, 713 (10th Cir. 2008) (evidence of racial harassment of others of which the plaintiff was not aware should be excluded).

3.   **EVIDENCE OF OTHER INFORMATION ABOUT TP THAT WAS NOT PROVIDED TO RELEVANT UNIVERSITY PERSONNEL DURING THE TITLE IX PROCESSES.**

The University anticipates that Plaintiffs will attempt to introduce evidence regarding information that was not provided to the Title IX Office for consideration during the Title IX proceedings. Such evidence is, again, irrelevant to establishing that relevant Title IX office personnel had actual notice of alleged discrimination against Plaintiffs and is inadmissible.

For example, during discovery, Doe 2 produced screenshots of purported messages from her roommate alleging that TP allegedly requested a "threesome" on December 5, 2017. These messages were not provided to the Title IX Office or any of the decision makers at the time they were adjudicating the matter. These messages, as provided by Doe 2 during discovery, are screenshots of messages and do not contain any distinctive characteristics such as a date or time and it is impossible to actually determine if the messages were created at that time or sometime during the pendency of this lawsuit. Such evidence is also classic hearsay.

In addition to being irrelevant, information not provided to the University's Title Office personnel during its processes is prejudicial and confusing and should be excluded under FRE 403. Again, such evidence is highly prejudicial and would confuse and mislead the jury about whether relevant University personnel had actual notice of TP's alleged discrimination prior to December 2017.

Evidence related to information about TP that was not provided to Title IX personnel during its processes should be excluded.

4.   **EVIDENCE OF TP'S RACE.**

Plaintiffs may attempt to introduce evidence related to TP's race. For instance, Ms. Diamond Scott (a member of the University's Title IX Office) is the same race as TP (Black).

11

Indeed, Ms. Scott and TP were the only individuals involved in the entire process who are of a different race than Plaintiffs and other University employees

### A. TP's race is not relevant to any issue in this case.

As noted above, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. FRE 401. This is a gender discrimination claim, not a race discrimination claim. Simply put, TP's race is not relevant to any issue in this Title IX action and has zero probative value.

### B. Disclosure of TP's race is inadmissible under FRE 403.

In addition to being irrelevant, evidence of TP's race should be excluded because it is highly prejudicial and likely to mislead the jury. *Barclay*, No. C 07-4074-MWB, 2009 WL 2462296, at *3 (quoting *United States v. Adams*, 401 F.3d 886, 900 (8th Cir. 2005)) ("Unfairly prejudicial evidence has also been described as evidence that is so inflammatory on its face as to divert the jury's attention from the material issues in the trial"); *Lee*, 829 F. Supp. 2d at 751 (quoting *Chism v. CNH America, LLC*, 638 F.3d 637, 642 (8th Cir. 2011) (upholding exclusion of evidence that could "raise extraneous controversial issues, confuse the issues, and be more prejudicial than probative").

Permitting evidence of TP's race has the clear potential to arouse bias on the jury. Any mention, reference, or evidence of TP's race is inadmissible and should be excluded.

## 5. EVIDENCE THAT TP PLAYED ON A SPORTS TEAM OR WAS A "STAR ATHLETE."

Plaintiffs have repeatedly claimed in their pleadings and other filings that TP was purportedly a "star basketball player." TP's membership on a sports team has no bearing on this case, and reference to his participation on a sports team is both irrelevant and prejudicial.

First, whether or not TP played a sport – whether as a "star" or bench warmer – is completely irrelevant to the issues in this case. No alleged discrimination by TP toward Plaintiffs allegedly took place in the context of University athletics (it allegedly occurred off-campus in Plaintiff Doe 1's workplace and Doe 2's off-campus housing). There is also not one shred of evidence that TP was treated differently by anyone working in the University's Title IX Office because he participated in a sport. There is also no evidence that Plaintiffs were discriminated against because TP played a sport. Indeed, this is a gender discrimination claim, not a claim about favoritism toward people who participate in sports (after all, hundreds of female students play sports at the University). No deposition testimony or other evidence supports any connection between TP's status as a student-athlete and any allegation of discrimination raised by Plaintiffs.

Nonetheless, Plaintiffs and their counsel have repeatedly stated that TP was a "star athlete" insinuating – without any support whatsoever – that he was therefore was treated more favorably than Plaintiffs. We should not forget, however, that TP was given a no-contact order, was removed from his team, was held responsible on various allegations, never had any additional contact with Plaintiffs on campus, and never returned to campus after the University was put on notice of Plaintiffs' concerns. Evidence and statements about TP's status as a student athlete is irrelevant and inadmissible under FRE 401 and 402.

Such evidence is also inadmissible under FRE 403. Any reading of Plaintiffs' Second Amended Complaint (Doc. 75) and other filings – and their repeated references to TP as being a "star athlete" – makes it clear that his status as a student-athlete is being used in an effort to prejudice the jury against student athletes generally, TP in particular, and, by extension, the University. We respectfully submit that the only purpose in telling the jury that TP was an

athlete would be to tap into prejudices and biases regarding athletes generally, and TP specifically, despite that the fact that his participation as an athlete has no relevance to this case. FRE 403.

Evidence, statements and arguments about TP's status as an athlete should be excluded.

6. **EVIDENCE PERTAINING TO MS. SCOTT UNRELATED TO HER ROLE AS A TITLE IX INVESTIGATOR.**

The University anticipates Plaintiffs will attempt to introduce evidence related to Ms. Scott's personal affiliations or activities unrelated to her role as a Title IX Investigator. For instance, Plaintiffs have attempted to paint Ms. Scott as biased because she was a basketball fan. Doc. 75, at p. 43. Such evidence insinuates some inappropriate or nefarious connection between Ms. Scott and TP – one that simply did not exist and that has no relevance to this case. This evidence is clearly irrelevant and should be excluded due to its lack of probative value. FRE 401 and 402.

Again, such evidence and argument is also prejudicial and confusing. Like evidence and argument about TP's participation in sports, Ms. Scott's attendance at basketball games is designed to improperly create an inference of favoritism toward TP and discrimination against Plaintiffs. But attending basketball games is not in any way probative of discrimination against Plaintiffs. Moreover, any minimal probative value (and there is none) is far outweighed by its prejudicial impact and the likelihood that it would confuse and mislead the jury.

7. **EVIDENCE REGARDING ANY ALLEGED TITLE IX REPORTS, COMPLAINTS, INVESTIGATIONS, OR PROCEEDINGS UNRELATED TO TP OR PLAINTIFFS' TITLE IX REPORTS.**

The University anticipates Plaintiffs will attempt to introduce evidence of Title IX processes unrelated to Plaintiffs and TP's alleged gender discrimination towards them. This evidence and argument are irrelevant to Plaintiffs' claims and should be excluded.

14

For instance, Plaintiffs have frequently referred to a *St. Louis Post Dispatch Article* published on February 14, 2019, to a publicly available Annual Security Reports generated by the University, and to an article in an on-line publication from 2014 regarding a female member of the University's swim team. None of this evidence is relevant or admissible for a variety of reasons.

### A. News articles about the University's IX process are inadmissible.

Plaintiffs quoted language from the *St. Louis Post Dispatch* article in their Second Amended Complaint. Doc. 75, ¶ 5. Similarly, Plaintiffs referred to an on-line cbssports.com article in their recent summary judgment response regarding damages.[5] Doc. 164, p. 14. These news articles are irrelevant to Plaintiffs' claims in this case and have nothing to do with their Title IX allegations regarding TP. FRE 401 and 402.

These articles are also clearly out-of-court statements, offered in an improper attempt to prove the truth of the statements. The articles should also be excluded as inadmissible hearsay under FRE 801 and 802.[6]

---

[5] Plaintiffs' Exhibit 9 to their Suggestions on Opposition (Doc. 164-9) is an article related to the tragic suicide of a former student.

[6] Hearsay statements (out of court statements, offered for the truth of the matter asserted) are inadmissible under FRE 801 and 802. *See Plamp*, 565 F.3d at 460 (upholding exclusion of out-of-court statements regarding other reports as hearsay); *see also Chadwell v. Koch Refining*, 251 F.3d 727, 731 (8th Cir. 2001) (upholding exclusion of notes and report of third party, as the "out-of-court statements . . . clearly constitute hearsay evidence"); *Massey v. Mortgage Electronic Registration Systems*, 2010 WL 2104549, at *2 n. 3 (D. Minn. 2010) (noting that hearsay statements from several third parties dissatisfied with defendant's services were improper evidence). Plaintiffs' reliance on statistics in the *St. Louis Post Dispatch* are inadmissible. To the extent the statistics in the article purport to quote University statistics, such information in the article is untrustworthy and is not the most probative evidence available. *Crews v. Monarch Fire Prot. Dist.,* stating that newspaper articles are "rank hearsay" that do not fit within a hearsay exception. 771 F.3d 1085, 1092 (8th Cir. 2014). *See also In re Acceptance Ins. Companies, Inc. Sec. Litig.,* 352 F. Supp. 2d 940, 950 (D. Neb 2004), *aff'd sub nom. In re Acceptance Ins. Companies Sec. Litig.*, 423 F.3d 899 (8th Cir. 2005) (finding that newspaper articles are hearsay, and double hearsay).

Also, these articles are also highly prejudicial (outweighing any minimal probative value), are likely to confuse the jury, and will needlessly lengthen the trial.  FRE 403.  Were such evidence to be introduced, the University would have no choice but to introduce evidence rebutting claims relating to other Title IX proceedings, greatly complicating and lengthening the case.  The news articles should be excluded.

### B.      University statistics relating to other Title IX matters should be excluded.

Annual Security Reports and other statistical information concerning reports made to the University unrelated to TP or Plaintiffs are irrelevant to any issue in this case.  FRE 401 and 402. Statistics detailing the number reports, the number of investigations, and the outcomes regarding events wholly unrelated to TP or Plaintiffs tell the jury nothing about whether relevant University personnel had actual notice of TP's alleged discrimination or were deliberately indifferent to TP's alleged discrimination.  Even assuming *arguendo* that the University were open to criticism for the way it handled other Title IX processes (and it should not be), such criticism has no bearing on whether relevant University personnel were deliberately indifferent to actual notice of TP's alleged discrimination toward Plaintiffs.  This is a two-plaintiff gender discrimination case, not a class action or collective action.

Introduction of unrelated statistics is also highly prejudicial, likely to confuse the jury, and would needlessly lengthen the trial.  FRE 403. Such evidence inappropriately injects other proceedings, conducted at other times and pursuant to other policies or procedures, involving other persons and University personnel, and involves other unique factual circumstances.  All of these factors mean that the University would be required to "try" countless other proceedings in this case.  Juror confusion would be inevitable.  A greatly lengthened trial would be assured.

16

And none of the evidence would assist a jury with regard to the issues that are relevant in this case.

Evidence and argument about Title IX proceedings unrelated to Plaintiffs should be excluded.

## 8. EVIDENCE THAT THE UNIVERSITY COULD/SHOULD HAVE HANDLED ITS TITLE IX PROCESSES DIFFERENTLY, OR THAT THE TITLE IX PROCESSES REGARDING TP COULD/WOULD HAVE HAD DIFFERENT OUTCOMES.

Put simply, Title IX is not a negligence statute. *Davis*, 526 U.S. at 641-642 (rejecting negligence standard). Relatedly, the *Davis* Court explicitly rejected the notion that alleged victims of peer-on-peer discrimination have a right under Title IX to make "particular remedial demands," and held that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." 526 U.S. at 648-649. The Court held that school administrators continue to enjoy the "flexibility they require" and are not liable unless their response is "clearly unreasonable" – an issue that is resolvable on a "motion to dismiss, for summary judgment, or for a directed verdict." *Id.* The Eighth Circuit has succinctly held that "dissatisfaction with [a] school's response does not mean the school's response can be characterized as deliberate indifference." *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019).

It is undisputed that the University conducted four separate hearings regarding allegations involving TP, two of which involved claims raised by Plaintiffs. It is also undisputed that the hearing panels found TP partially responsible. Nonetheless, Plaintiffs filed this lawsuit alleging dissatisfaction with the outcome of the Title IX processes. The University anticipates that Plaintiffs will argue that the outcomes of these hearings could have come out differently had relevant University personnel handled matters differently.

17

Plaintiffs' claims that University personnel could have handled its investigations differently, or conducted the four hearings related to TP differently, or communicated differently with Plaintiffs about their status as non-complainants, or applied its CRRs differently, or failed to follow Title IX regulations (and so forth), is irrelevant to proving deliberate indifference by relevant Title IX personnel to actual notice of TP's alleged discrimination towards Plaintiffs and falls squarely into area of prohibited second-guessing of the University prohibited in *Davis* and *Maher*. This is evidence, at most, asserts a claim of negligence, not deliberate indifference, and it should be excluded. FRE 401 and 402.

For the same reasons, arguments or evidence that the University did not follow the CRRs "to the letter" are also excludable. The Eighth Circuit has followed the Supreme Court's cautioning: "alleged failure to comply with the [Title IX] regulations does not establish actual notice and deliberate indifference and it has never held that 'the implied private right of action under Title IX allows recovery in damages for violation of [such] administrative requirements.'" *Roe v. St. Louis Univ.*, 746 F.3d 874, 883 (8th Cir. 2014) quoting *Gebser,* 524 U.S. at 291-92. Thus, Plaintiffs cannot argue that alleged technical violations of the CRRs give rise to a Title IX violation.

Evidence or argument that the University could or should have handled its Title IX processes differently is also inadmissible under FRE 403. Were such evidence to be admitted, the jury would clearly be confused as to what is relevant to proving deliberate indifference to actual notice of gender-based discrimination. This case would devolve into a negligence case – what the University allegedly should have known, and what the University allegedly should have done. But Title IX requires proof of deliberate indifference, not negligence. *Davis*, 526 U.S. at 641-642 (rejecting negligence standard).

Lastly, it is entirely speculative for Plaintiffs to argue that had the University done this or that differently a different outcome would have resulted. There is simply no way to know what might have happened, and it is inappropriate for Plaintiffs, their witnesses, or their counsel to speculate. Jurors are empaneled to decide facts relevant to legal claims, not to speculate about other possible outcomes.

Evidence and argument about different actions that could or should have been taken by University Title IX personnel, or that different outcomes could or would have resulted, is inadmissible and should be excluded.

## 9. EVIDENCE THAT TP MADE STATEMENTS ABOUT PLAINTIFFS OR OTHERS ON HIS PERSONAL SOCIAL MEDIA ACCOUNTS.

The University anticipates Plaintiffs may attempt to introduce evidence related to their allegation in the Second Amended Complaint and other filings that TP made offensive posts on social media after the conclusion of the Title IX proceedings. Allegations pertaining to such evidence should be excluded.

Plaintiffs do not allege that TP engaged in gender-based discrimination on campus after Plaintiffs alerted relevant Title IX personnel to their concerns in December of 2017. Indeed, it is undisputed that TP had no contact with Plaintiffs on campus following Plaintiff Doe 2's report to the Title IX personnel in December of 2017. Instead, Plaintiffs claim that TP, off campus, using his own social media accounts, made statements about Plaintiffs after the University's Title IX processes had concluded.

Without question, public Universities are constrained in what they can and cannot do about students' off-campus, on-line speech.[7] Moreover, the reach of Title IX relates only to

---

[7] In fact, in *Davis*, the Supreme Court noted "it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory

alleged discrimination regarding the provision of educational programs and services, not to all conduct between students. 20 U.S.C. § 1681. Title IX prohibits discrimination *in the provision of educational services and programs* "on the basis of sex" not all alleged misconduct by one student toward another. *Id.*

Any evidence or argument regarding TP's off-campus comments on his personal social media accounts are irrelevant to the issues before the jury and must be excluded under FRE 401. The evidence is not relevant to actual prior notice of gender discrimination (the social media postings are alleged to have occurred long after Title IX Office personnel initiated investigations and processes), nor is it relevant to show deliberate indifference to such actual notice.

Such evidence and argument is also inadmissible under FRE 403 because it is prejudicial, confusing, and would consume valuable trial time. Again, TP's actions cannot be attributed to the University under a theory of *respondeat superior* or agency. Yet the jury would be confused into thinking that TP's social media communications are somehow relevant to this case and attributable to the University.

Evidence and arguments about TP's social media posts about Plaintiffs is inadmissible and should be excluded.

---

claims." *Davis*, 526 U.S. at 649. Given the Supreme Court's ruling in *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 210 L. Ed. 2d 403 (2021) (finding school district violated student's First Amendment rights when it suspended her from the junior varsity cheerleading squad based on profanity made in an off-campus social media post), Plaintiffs should not be able to argue that the University had some obligation to address off-campus social media posts by TP.

**10.    ALLEGED "COMPENSATORY DAMAGES" NOT PROPERLY DISCLOSED PURSUANT TO FRCP RULE 26.**

Plaintiffs sought "compensatory damages" in their Second Amended Complaint.  Doc. 75, p. 32.  FRCP Rule 26(a)(1)(A)(iii) required Plaintiffs to timely provide "a computation of each category of damages" as well as all supporting documents.  FRCP Rule 26(e)(1)(A) required Plaintiffs to timely supplement their interrogatory answers and Rule 26 disclosures.  If a party does not follow these rules, "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or was harmless." FRCP 37(c)(1).

This case has been on file since 2019.  Doc. 1. Just a few days ago, on August 3, 2020, after the University filed its Motion for Summary Judgment on damages, nine months after the close of discovery (Doc. 95, p. 2), and on the eve of trial, Plaintiffs served "Amended Rule 26(a)(1) Disclosures" and supplemental interrogatory answers.  Docs. 164-1, 164-2, 164-5. Plaintiffs' last-minute disclosures for the first time supplied a purported itemization and calculation of Plaintiffs' alleged compensatory damages. *Id*.

Plaintiffs' last-minute disclosures are entirely inappropriate:

- On October 12, 2020, Plaintiffs responded to interrogatories that required Plaintiffs to "state the total amount of damages," "and with specificity and in detail, list each and every item from which this sum is derived," and "each person with knowledge of such damages, and what efforts you have made to mitigate your damages."  Doc. 147-2, pp. 2-3, 5-6.  Plaintiffs stated that "the extent of her damages have not been finalized" but

assured the University that "this interrogatory will be supplemented in compliance with the Federal Rules of Civil Procedure." *Id*.

- On June 21, 2021, Plaintiffs served "supplemental" answers to interrogatories again stating that "the extent of her damages have not been finalized" and again promising the University they would timely supplement under the Rules. *Id*., pp. 10-11, 14-15.

- On the same day (June 21, 2021), Plaintiffs served their initial Rule 26 disclosures. *Id*., pp. 17-18 (Exhibit C to Doc. 147). Again, Plaintiffs failed to provide any itemization of alleged damages as mandated by Rule 26 and reiterated that "the extent of their damages have not been finalized" and again promised to timely supplement. *Id*.

Despite their repeated reassurances to timely provide discovery responses and Rule 26 disclosures, Plaintiffs never did so. Instead, many months after the close of discovery, and after the University filed this Motion, and on the eve of trial, Plaintiffs provided the information the University was entitled to receive years prior.

There is no basis for this Court to conclude that Plaintiffs' last-minute disclosures were either "substantially justified" or "harmless." Rule 37; Doc. 164. Plaintiffs previously offered three arguments seemingly (although not explicitly) for why their failure to comply with Rule 26 should be ignored. None have merit.

First, Plaintiffs argued that that the temporary mutual delay of serving initial disclosures due to FERPA concerns warranted their years-long delay in disclosing their damages and providing the required calculation under Rule 26. Doc. 164, p. 21, n. 8. But Plaintiffs provided Rule 26 disclosures in June of 2021 and promised to timely supplement – they failed to do so despite having ample time.

Second, Plaintiffs claimed that the University did not ask questions about damages in Plaintiffs' depositions. *Id.* This argument is incorrect. Plaintiff Doe 1's deposition was taken on February 19, 2021 (Doc. 164-6), and Plaintiff Doe 2's deposition was taken on March 5, 2021 (Doc. 164-7). At this point in discovery, Plaintiffs had responded to detailed damages interrogatories stating that "the extent of her damages have not been finalized" but assured the University that "this interrogatory will be supplemented in compliance with the Federal Rules of Civil Procedure." *Id.* Doc. 147-2, pp. 2-3, 5-6. Indeed, *even after Plaintiffs' depositions*, Plaintiffs stated in their Rule 26 disclosures and amended interrogatory answers in June of 2021 that "the extent of her damages have not been finalized." Doc. 147-2, pp. 10-11, 14-15, 17-18. The University, of course, had an iron-clad right to rely on Plaintiffs' sworn answers to interrogatories and Rule 26 disclosures – which Plaintiffs repeatedly assured would be timely supplemented. And, of course, the University had no obligation under the Rules to ask damages questions in the depositions of the Plaintiffs who we now know would not have been in a position to describe their damages.

Third, Plaintiffs argued that they discussed various purported damages during mediations. Doc. 164, p. 21, n. 8. Statements at negotiations and mediations – confidential as they are – are not a substitute for sworn interrogatory answers or timely Rule 26 disclosures and we seriously doubt Plaintiffs would claim that parties could use such statements as evidence in any pleading, motion, or trial. Nothing in Rules 26 or 27 or any case law supports this argument.

Plaintiffs are barred from seeking to introduce evidence at trial of damages that they failed to timely disclose. *Carmody v. Kansas City Bd. of Police Com'rs*, 713 F.3d 401 (8th Cir. 2013) (precluding damage claims that were not properly disclosed). Permitting Plaintiffs to

submit evidence or make arguments about damages that they clearly failed to timely disclose without any justification would be highly prejudicial to the University. The University, like any other litigant, is entitled to fair notice of the nature, amount, and bases of each item of damage Plaintiffs seek. Rules 26 and 37 codify these fair notice requirements; they are mandatory, not optional. Over the three years of this litigation, Plaintiffs had ample opportunity to provide information about their claimed damages but failed to do so. Plaintiffs repeatedly reassured the University that they would timely supplement their interrogatory answers and Rule 26 disclosures and the University had every right to rely on these repeated reassurances. But Plaintiffs failed to do what they said they would do.

Plaintiffs should be precluded from introducing any evidence of "compensatory damages" at trial.

## 11.  ALLEGED PUNITIVE DAMAGES AND RELATED EVIDENCE.

This Court has entered an Order striking Plaintiffs' claims for punitive damages under Title IX, citing and relying on *Barnes v. Gorman*, 536 U.S. 181 (2002), and *Cumming v. Premier Rehab v. Keller, P.L.L.C.*, 142 S.Ct. 1562 (2022). Doc. 155. Plaintiffs did not seek punitive damages in their breach of contract Count (Count IV). Alleged punitive damages are not available in this case.

Under federal law, a party may only recover punitive damages by establishing that the defendant acted with "malice" or "reckless indifference" to the plaintiff's legal rights. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535-536 (1999). These concepts involve proof of intentional discrimination "in the face of a perceived risk that its actions will violate federal law" and "a positive element of conscious wrongdoing is always required." *Id*. at 537-538.

24

Because punitive damages are unavailable to Plaintiffs, they should not be permitted to state, claim, argue, or introduce evidence purporting to show that University personnel acted maliciously toward Plaintiffs, or that they acted with reckless indifference to Plaintiffs' Title IX rights. So, for instance, it would be inappropriate for Plaintiffs' counsel to attempt to introduce evidence or argue that University personnel acted with evil motives or maliciousness toward Plaintiffs, or wantonly disregarded Plaintiffs' Title IX rights – or any other claims or arguments that might be relevant were punitive damages available in this case. Similarly, Plaintiffs are barred from arguing or introducing evidence that University violated Title IX with regard to other students[8] or the University more broadly.[9] Aside from being entirely irrelevant to *Plaintiffs'* gender discrimination claims, such evidence is clearly designed to attempt to show that University personnel act with conscious disregard of the Title IX rights of female students. This assertion is patently false, but regardless, such arguments and evidence are inadmissible for numerous reasons,[10] including that fact that Plaintiffs cannot assert claims for punitive damages.

---

[8] In responding to the University's motion for summary judgment regarding damages, Plaintiffs inappropriately included an inadmissible claim that "[t]here is a clear pattern of misconduct on behalf of the University with respect to its investigation of Title IX claims going back decades," citing an on-line article entitled "*See* Parents of Mizzou Swimmer Who Committed Suicide: 'This has to stop,' cbssports.com (January 30, 2014) . . ." Doc. 164, p. 14.

[9] Plaintiffs claimed in their Second Amended Complaint that the "University's failure to follow the dictates of Title IX, as well as its own policies, is well-documented. On February 14, 2019, *The St. Louis Post-Dispatch* reported that from 2015 to 2018 . . .there were more than 3,000 allegations of misconduct reported to the Title IX Office . . ." Doc. 75, ¶ 5.

[10] For instance, articles from newspapers or on-line sources are classic hearsay barred by FRE 801 and 802. Moreover, the probative value of such evidence (there is none) is clearly outweighed by its prejudicial impact and must be excluded under FRE 403.

**12.    ALLEGED EMOTIONAL DISTRESS DAMAGES AND RELATED EVIDENCE.**

Just days ago, this Court held that *Barnes* (a Title VI claim) and *Cummings* are "binding and unequivocal precedent" barring Plaintiffs' Title IX punitive damage claims. Doc. 155, p. 2. This Court was absolutely correct in so holding. But inexplicably, Plaintiffs' filings have failed to even mention this Court's recent ruling and its reliance on *Barnes* and *Cummings*. Doc. 164. Nonetheless, *Cummings* makes it abundantly clear that the decision bars the recovery of emotional distress (and punitive) damages under each of the four Spending Clause statutes discussed in the case, including Title IX.

We begin with the conclusion in *Cummings*: "For the foregoing reasons, we hold that emotional distress damages are not recoverable under the **Spending Clause antidiscrimination statutes** we consider here." 142 S.Ct. at 1576 (emphasis added). Throughout the opinion, the Court repeatedly analyzed four Spending Clause statutes together, frequently referring to Title IX explicitly and to cases involving Title IX claims. *See e.g., Id*. at 1568 ("Exercising this authority, Congress has passed **a number of statutes** prohibiting recipients of federal financial assistance from discriminating based on certain protected characteristics"); *Id*. ("We have held that **these statutes** may be enforced through implied rights of action . . ."); *Id*. at 1569 ("Congress has enacted **four statutes** prohibiting recipients of federal financial assistance from discriminating based on certain protected grounds . . . **Title IX** of the Education Amendments of 1972 similarly prohibits sex-based discrimination . . ."); *Id*. ("None of **these statutes** expressly provides victims of discrimination a private right of action to sue the funding recipient in federal court. But as to both Title VI and **Title IX**, our decision in *Cannon v. University of Chicago* [citation omitted] 'found an *implied* right of action'"); *Id*. at 1569-1570 ("Although it is 'beyond dispute that private individuals may sue to enforce' **the**

**antidiscrimination statutes** we consider here, 'it is less clear what remedies are available in such a suit.' . . . In *Franklin*, we considered whether monetary damages are available as a remedy for intentional violations of **Title IX** (and, **by extension, the other statutes we discussed**). We answered yes, *ibid.*, but 'did not describe the scope of 'appropriate relief.''") (emphasis added). Even the dissent in *Cummings* analyzed the four Spending Clause statutes together and observed that the Court's holding applied to all four:

> Using its Spending Clause authority, Congress has enacted **four statutes** that prohibit recipients of federal funds from discriminating on the basis of certain protected characteristics, including (depending upon the statute) race, color, national origin, sex, disability, or age. . . [including] **Title IX**, 20 U.S.C. § 1681 . . . Today, the Court holds that the compensatory damages available under **these statutes** cannot include compensation for emotional suffering.

*Id.* at 1577 (emphasis added). Any reading of *Cummings* makes it clear that it applies with equal force to each of the four Spending Clause statutes discussed, and to Title IX in particular.

Just as importantly, the whole point of *Cummings* is that a particular remedy is "appropriate relief" in a private Spending Clause action (like Plaintiffs' Title IX claims) "only if the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to liability of that nature." *Id.* at 1570 (emphasis original). The *Cummings* Court concluded that emotional distress damages are unavailable under any of the four Spending Clause statutes discussed, including Title IX, because recipients are not on notice of such damages claims. *Id*. at 1576. That settles the question before this Court.[11]

---

[11] Plaintiffs' previous citation to older cases from other Circuits concerning remedies under Title IX, *Id*. at 18-19, is not helpful. All of the cases were decided prior to *Cummings*. Similarly, Plaintiffs' invitation to ignore *Cummings* in order to achieve policy goals, *Id*. at 19, asks this Court to disregard of our system of precedent and *stare decisis*. As this Court so aptly put it, "[g]iven this binding and unequivocal precedent, the Court cannot but conclude that punitive damages are not available in connection with the claims under Title IX." Doc. 155, p. 2.

Plaintiffs' have previously incorrectly argued that Title IX is based on the Fourteenth Amendment, citing *Crawford v. Davis*. Doc. 164, pp. 17, 19. The question before the *Crawford* Court was whether the Eleventh Amendment "deprives us of jurisdiction to hear Ms. Crawford's claims" under Title IX. 109 F.3d. at 1292-1293. In considering the Eleventh Amendment immunity question before it, the Court asked the *hypothetical* question relevant to its Eleventh Amendment analysis: "whether Congress . . . *could have* enacted Title IX pursuant to § 5 of the Fourteenth Amendment." *Id.* at 1293. *Crawford* did not hold, nor could it have, that Title IX was enacted pursuant to the Fourteenth Amendment as Plaintiffs assert. Title IX was enacted pursuant to the Spending Clause, not the Fourteenth Amendment, and Title IX (like all Spending Clause statutes) expressly conditions receipt of federal funds on recipients' compliance with the statute. *Cummings*, 142 S.Ct. at 1569-1570 (statutes, including Title IX, were enacted pursuant to the Spending Clause). *Cummings* makes no mention of the Fourteenth Amendment, nor is the Fourteenth Amendment relevant here.

Lastly, Plaintiff's prior citation to a district court case from Indiana is also unhelpful. In that case, *Doe v. Purdue University*, 2022 WL 2828238 (N.D. Ind. 2022), Magistrate Martin's entire analysis consisted of just one sentence: "Because *Cummings* was not a Title IX action, it does not make evidence of emotional distress or harm inadmissible in this case." *Id*. at *4. The lack of any analysis to support such a statement is reason enough to reject it. And, of course, a one-sentence statement from a district court in another Circuit has no precedential value. But most importantly, the statement is simply wrong as this Court has correctly held. Doc. 155, p. 2 (*Barnes* and *Cummings* are "binding and unequivocal precedent" applicable to this case).

Plaintiffs are barred from seeking emotional distress damages in this case. We now turn to the sorts of evidence and arguments Plaintiffs are precluded from introducing or making.

**A.** **Plaintiff Doe 1's alleged "emotional damages" and related evidence and argument.**

Plaintiff Doe 1's August 3, 2022, untimely "Amended Rule 26(a)(1) Initial Disclosures" for the first time asserted a claim for "Emotional Damages: $36,000." Doc. 164-5, p. 2. These damages are not recoverable under Title IX and *Cummings*. As a result, Plaintiff Doe 1 should be precluded from introducing evidence, making statements about, or making arguments supporting any claim that she suffered alleged emotional distress attributable to the University. Such evidence has no probative value and does not relate to any issue in the case and thus is "not of consequence in determining the action." FRE 401. Moreover, permitting Plaintiff Doe 1 to discuss such evidence or allegations would be highly and unfairly prejudicial to the University, would be confusing to the issues in the case, would mislead the jury into thinking such evidence and argument was relevant, and would unnecessarily waste trial time. FRE 403.

**B.** **Plaintiff Doe 2.**

      **1.** **Alleged "emotional damages."**

Plaintiff Doe 2's August 3, 2022, untimely "Amended Rule 26(a)(1) Initial Disclosures" for the first time asserted a claim for "Emotional Damages: $873,600." Doc. 164-5, p. 2. These damages are not recoverable under Title IX and *Cummings*. As a result, Plaintiff Doe 2 should be precluded from introducing evidence, making statements about, or making arguments supporting any claim that she suffered alleged emotional distress attributable to the University. Such evidence has no probative value and does not relate to any issue in the case and thus is "not of consequence in determining the action." FRE 401. Moreover, permitting Plaintiff Doe 2 to discuss such evidence or allegations would be highly and unfairly prejudicial to the University, would be confusing to the issues in the case, would mislead the jury into thinking such evidence and argument was relevant, and would unnecessarily waste trial time. FRE 403.

### 2. Evidence relating to Dr. Michael Jarvis.

Plaintiff Doe 2 will seek to introduce the testimony of Dr. Michael Jarvis. Doc. 164, pp. 12-13. The testimony of Dr. Michael Jarvis should be excluded. Dr. Jarvis examined Plaintiff Doe 2 at the request of Plaintiffs' counsel (he was a retained expert, not a treating physician). The sole purpose of Dr. Jarvis' testimony was to discuss Plaintiff Doe 2's emotional distress claims – claims that have no relevance to this case. *Id.* Such evidence has no probative value and does not relate to any issue in the case and thus is "not of consequence in determining the action." FRE 401.

Moreover, permitting Dr. Jarvis to testify about Plaintiff Doe 2's alleged emotional distress would be highly and unfairly prejudicial to the University, would be confusing to the issues in the case, would mislead the jury into thinking such evidence and argument was relevant, and would unnecessarily waste trial time. FRE 403. On this last point, presenting Dr. Jarvis' testimony would take significant trial time, and would trigger the calling of the University's responsive expert, Dr. Kimberly Brown of Vanderbilt University – also necessitating considerable trial time and expense.

### 3. Evidence of mental health treatment and alleged medical expenses.

Plaintiff Doe 2 also will seek to introduce evidence of her mental health treatment by various treating health care providers. See Doc. 164, p. 11. Plaintiff Doe 2 will also seek to introduce expenses for her treatment. For the reasons already noted above, such evidence is irrelevant under FRE 401 and should also be excluded under FRE 403.

### 4. Other allegations or evidence of Plaintiff Doe 2's state of mind.

Plaintiff Doe 2 and Dr. Jarvis have described her state of mind, including highly personal details of her mental health. For all of the reasons described above, such evidence is irrelevant

under FRE 401 and should be excluded under FRE 403. We only add that these personal details having no relevance to the case should be excluded from evidence and argument because their personal nature. The University has no wish to explore these matters at trial but would have no choice were Plaintiff to choose to do so. Given the sensitive nature of this information, if the Court wishes to explore the matter further, we would prefer to discuss the matter with the Court rather than in a publicly available filing.

**13.    ALLEGED CONTRACT OR *CUMMINGS* DAMAGES AND RELATED EVIDENCE.**

Plaintiffs claim that they can recover "contract-type" damages other than emotional distress damages consistent with *Cummings*, Doc. 164, pp. 20-21, and purportedly seek "counseling services,"[12] "lost wages," "housing costs," and "tuition expenses." *Id.* None of these damages, however, are recoverable in this case and, as a result, any evidence or argument relating to such alleged damages should be excluded.

First, such alleged damages are not recoverable because Plaintiffs cannot assert claims for breach of contract. The University has fully briefed why it is entitled to summary judgment as to Plaintiffs' breach of contract claims in Count IV of their Second Amended Complaint, and those arguments will not be repeated here. Because Plaintiffs cannot assert claims for breach of contract, evidence of damages relating to such alleged breach are irrelevant and unduly prejudicial under FREs 401 and 403.

Second, as discussed above, even were Plaintiff able to seek such damages, Plaintiffs failed to timely disclose any such alleged damages in their sworn interrogatory answers or as

---

[12] Plaintiff Doe 2's claims for costs associated with counseling services are dealt with more fully above. But such alleged damages are also excludable because they are not cognizable damages under Missouri law for the breach of contract (the Title IX CRRs) Plaintiffs allege in this case.

required by Rule 26.  Nor did Plaintiffs provide substantial justification for their recent untimely disclosures, or establish that their untimely disclosures were harmless.  Indeed, Plaintiffs have asserted a breach of contract claim since August 2, 2021 (Doc. 75), and have had ample time to timely disclose any alleged contract damages.  Plaintiffs' delays are unjustified and highly prejudicial to the University as noted above and for this additional reason evidence and arguments about such claimed damages should be excluded.

Third, none of the categories of alleged "contract" or *Cummings* damages that Plaintiffs now claim are recoverable under settled Missouri law.  Recoverable contract damages are "only those which are incidental to, and directly caused by, the breach, and may reasonably be supposed to have entered into the contemplation of the parties, and not speculative profits or accidental or consequential losses . . ." *Guidry v. Charter Commc'ns, Inc.*, 269 S.W.3d 520, 533 (Mo. App. 2008) (reversing an award of $706,000 in damages as speculative).  This principle "limits the reach of redress" in breach of contract actions and has been blackletter law for more than a hundred years in Missouri.  *Id*.

Plaintiffs cannot demonstrate that their untimely and ambiguous claims for "counseling services," "lost wages," "housing costs," and "tuition expenses" were either proximately caused by the University's alleged breach of its internal "Collected Rules and Regulations" (CRRs) concerning Title IX processes,[13] or that they were reasonably contemplated by the parties.  For instance, Plaintiffs cannot credibly claim that their alleged lost wages were proximately caused by the University's alleged failure to comply with its internal Title IX CRRs, or were contemplated by the parties, and such damages are also wholly speculative.

---

[13] The CRRs upon which Plaintiffs rely make no mention of consideration, damages, or any related matter.

Plaintiffs' claim for "housing expenses" fares no better: Plaintiffs were not living in University housing during any relevant time period. Plaintiffs would have incurred housing expenses no matter where they went to school. Plaintiffs' tardy Rule 26 disclosures provide no information about where Plaintiffs lived, or how their living expenses increased (if they did), or any other number of problems with such claimed damages.

The same can be said of Plaintiffs tuition claims. Plaintiffs would presumably have incurred tuition wherever they attended. Plaintiffs' bare and untimely August 3, 2020, Rule 26 disclosures provide no additional information explaining such alleged damages.

None of these common-sense problems with their damage claims are discussed in Plaintiffs' response, nor can the University now go back, on the eve of trial, and explore the speculative nature of Plaintiffs' contract damage claims, or whether Plaintiffs mitigated[14] their alleged damages, because discovery is closed, trial is imminent, and there simply is no time to conduct meaningful discovery.

Plaintiffs' purported contract and *Cummings* damages are not recoverable in this case. As a result, any evidence, statements, or argument about such alleged damages should be excluded.

## 14.  ALLEGED NOMINAL DAMAGES.

Plaintiffs made it known a few days ago for the first time that they will seek nominal damages in this case. Doc. 164, pp. 21-23. However, Plaintiffs cannot recover nominal damages in this case and any evidence or argument regarding such damages should be excluded.

---

[14] The University's interrogatories asked Plaintiffs to state "what efforts you have made to mitigate your damages." Doc. 153-1, pp. 2, 5, 9, and 14. Even Plaintiffs' latest amended interrogatory answers fail to address mitigation in any way. Docs. 164-1, 164-2.

FRCP Rule 8(a)(3) provides that a pleading "must contain . . . a demand for the relief sought." Plaintiffs did not plead a request for nominal damages at any time in this case, Docs. 1, 5, and 75. Even to this date, Plaintiffs have not requested leave to seek nominal damages. Plaintiffs are now foreclosed from seeking nominal damages.

In *Thomas R.W., By and Through Pamela R. v. Massachusetts Dept. of Educ.*, 130 F.3d 477 (1st Cir. 1997), the Court denied a request for nominal damages where the plaintiff failed to request nominal damages in the pleading and held that the general prayer for "such further relief as this court deems just and proper" did not preserve a request for nominal damages. *Id*. at 480. Similarly, in *Davis v. District of Columbia*, 158 F.3d 1342 (D.C. Cir. 1998), the plaintiff's Section 1983 complaint pleaded claims for compensatory and punitive damages but not nominal damages. *Id*. at 1345. The appeals Court rejected the plaintiff's nominal damages claim because "Davis never sought nominal damages" and declined to "strain to find inferences that are not available on the face of the complaint." *Id*; *see also Goichman v. City of Aspen*, 590 F.Supp. 1170, 1173 (D. Colorado 1984) (declining to permit request for nominal damages during summary judgment because "no prayer appears in the Complaint for such nominal damages"); *Alpha Iota Omega Christian Fraternity v. Moeser*, 2006 WL 1286186 (M.D.N.C. May 4, 2006) (declining to permit plaintiff to amend complaint to add claim for nominal damages after motion to dismiss filed because plaintiff failed to previously seek such damages). Plaintiffs' reliance on *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021), is misplaced. There, the plaintiffs explicitly sought nominal damages in their pleadings and placed the defendants on notice of their claim. *Id*. at 797 ("As relevant here, [plaintiffs] sought nominal damages and injunctive relief").

Permitting Plaintiffs to seek nominal damages for the first time now has no basis and would be highly prejudicial to the University. Plaintiffs are clearly seeking to expose the

University to a claim for attorneys' fees using nominal damages as the vehicle without having complied with pleading rules or basic fairness. Doc. 164, pp. 23-24. Plaintiffs' last-minute request for nominal damages is also problematic given the fair notice requirements underpinning *Cummings.* Plaintiffs' new, unplead request for nominal damages should be rejected.

Respectfully submitted,

TUETH KEENEY COOPER
MOHAN & JACKSTADT, P.C.

By: */s/ Ian P. Cooper*
    Ian P. Cooper, #32133MO
    Katherine L. Nash, #53782MO
    Aigner S. Carr, #69994MO
    34 N. Meramec Avenue
    Suite 600
    St. Louis, MO  63105
    Tel: (314) 880-3600
    Fax: (314) 880-3601
    icooper@tuethkeeney.com
    knash@tuethkeeney.com
    acarr@tuethkeeney.com

    ***Attorneys for Defendant***
    ***The Curators of the University of Missouri***

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorney of record:

CARMODY MACDONALD P.C.
Gerard T. Carmody
Ryann C. Carmody
Candace E. Johnson
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
gtc@carmodymacdonald.com

35

rcc@carmodymacdonald.com
cej@carmodymacdonald.com

**_Attorneys for Plaintiffs_**

_/s/ Ian P. Cooper_