# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

JANE DOE 1, *et al.*,

        Plaintiffs,

    v.

THE CURATORS OF THE UNIVERSITY OF MISSOURI,

        Defendant.

Case No. 19-cv-04229-NKL

## ORDER

This case is about two former students at the University of Missouri-Columbia, who told the University's Title IX Office in the Fall of 2017 that they had been sexually harassed or raped by T.P.[1]  Doe 1 reported that T.P. had stalked her and sent her unwelcome pictures of his penis. Doe 2 reported that T.P. had raped her and videotaped the rape.  However, rather than abiding by its procedures and allowing Plaintiffs to participate in the Title IX process, the University assumed the role as the complainant during the Title IX process and thereby denied them the rights, opportunities and protections promised to them under the University's policies.

Plaintiffs bring this action against the University, in part, pursuant to Title IX, 20 U.S.C. § 1681(a).  Title IX was passed by Congress and signed into law by President Richard Nixon on June 23, 1972, almost exactly fifty years ago. The statute prohibits educational organizations that receive federal funds from engaging in discrimination based on sex.  It begins: "No person … shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected

---

[1] The Court views the facts in the light most favorable to the parties opposing summary judgment—here, Plaintiffs. *See Inland Oil & Transport Co. v. U.S.*, 600 F.2d 725, 727–28 (8th Cir. 1979).

Case 2:19-cv-04229-NKL   Document 208   Filed 08/30/22   Page 1 of 59

to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Doe 1 and Doe 2 claim that the University violated their rights under Title IX because: (1) the University was deliberately indifferent to known acts of sexual misconduct by T.P. (Count I); (2) the University discriminated against Doe 1 and Doe 2 based on their sex and was intentionally biased in T.P.'s favor during the investigation and resolution of the Doe complaints, which resulted in an erroneous outcome at the hearings (Count II); (3) the University discriminated against Plaintiffs based on their sex during the Title IX process, including by assuming formal "Complainant" status contrary to their wishes (Count III); and (4) the University's policy of remaining neutral during Title IX proceedings heightened the risk of sexual misconduct on campus (Count V). Plaintiffs also claim the University breached contractual promises contained in its Collective Rules and Regulations (Count IV).

The University moves for summary judgment on all counts. Doc. 104. For the reasons discussed below, the Court GRANTS the University's Motion for Summary Judgment (1) as to Count I, insofar as it concerns the University's conduct prior to Doe 2's report of sexual misconduct, (2) as to Count I, insofar as it asserts claims by Doe 1, and (3) as to Count V in full. However, the Court DENIES summary judgment as to Count I, insofar as it alleges deliberate indifference following Doe 2's report of T.P.'s sexual misconduct, and as to Counts II, III, and IV in full.

## I.    MATERIAL FACTS[2]

### A.  The University's Title IX Process

The University's "Collective Rules and Regulations" ("CRRs") establish the University's

---

[2] Again, because this is a summary judgment motion, the Court views the facts in the light most favorable to the parties opposing summary judgment—here, Plaintiffs. *See Inland Oil & Transport Co. v. U.S.*, 600 F.2d 725, 727–28 (8th Cir. 1979).

policies prohibiting sex discrimination and govern the Title IX process.[3]  Students are told that they should report violations of the University's Sexual Harassment Policy to the Title IX Coordinator. *See,* CRR 600.030. At all relevant times, the University's Title IX Office is responsible for investigating and responding to reports of sex discrimination and harassment at the University.

The person alleged to have been subjected to discrimination, harassment or sexual misconduct in violation of the University's Anti-Discrimination Policies is referred to as the Complainant.  CRR 600.030(C)(2).  After a report of sexual harassment is made to the Title IX Office and before an investigation is begun, the Complainant is invited to speak with a Title IX investigator. The Complainant would be told what a "formal Complaint" would look like, and what would happen after a "formal Complaint" was filed. Doc. 122-15, at 5–6.  It appears that a "formal Complaint" is a written statement by the Complainant about the incident.  Doc. 122-15, at 5–6.  Both Does gave the Title IX Office a written statement about the incidents involving T.P.

Once a Complaint is filed, a notice of investigation is issued to the Title IX respondent— the alleged perpetrator.  The University can proceed with an investigation even if the Complainant chooses not to, but only if, "after due deliberation and based on the nature and severity of the Complaint, the Title IX Coordinator determines there is a sufficient basis to proceed" and "such a decision should be well-reasoned and documented."  CRR 600.020(E)(2).  Further, the Policy states that, "[i]n such cases, the Title IX Coordinator will inform the Complainant of the decision to commence an investigation."  *Id*.  The Policy also states, "The Title IX Coordinator or other

---

[3] The parties have identified the following CRRs that are relevant to Plaintiffs' claims:  600.010 Equal Employment/Educational Opportunity and Nondiscrimination Policy; 600.020 Sex Discrimination, Sexual Harassment and Sexual Misconduct in Education/Employment Policy; 600.030 Equity Resolution Process for Resolving Complaints of Discrimination, Harassment, and Sexual Misconduct against a Student or Student Organization; and 200.010 Standard of Conduct.

3

appropriate official should inform and obtain the consent from the Complainant before beginning an investigation." *Id.* The evidence in the Record might persuade the jury that Plaintiffs did not tell the University to not investigate and did not fail to cooperate with the University's investigatory efforts.

When an investigation is to be conducted, the Title IX investigator chooses which—if any—additional witnesses should be contacted and what evidence should be collected. Doc. 122-15, at 5–6 (Scott Dep. 20:2–22:21). After the Title IX investigator completes her collection of evidence, she drafts an investigative report. That report is submitted to the Title IX Coordinator, who is the head of the Title IX Office. The Title IX Coordinator then decides whether the complaint should move forward. The Title IX Coordinator may also direct the investigator to collect more evidence. If the case moves forward to the resolution process, the parties—the Respondent and the Complainant—decide how to proceed. The resolution process consists of either Administrative Resolution, where the Title IX Coordinator decides responsibility, or Hearing Panel Resolution, where a panel of three faculty or staff members determines responsibility. Doc. 122-15, at 5–6.

In rare situations, the University can take over the role of the "Complainant" for purposes of the "Equity Resolution Process". However, the CRRs of the University only permit this when the person subjected to discrimination, harassment or sexual misconduct chooses not to act as the Complainant, CRR 600.030(C)(2). The University exercises this option infrequently and only in unique circumstances. Doc. 105-5 at 16, 75 (Hayes Dep. at 20:2–18, 254:2–13). When the University takes over as the "Complainant", the alleged victim no longer has the ability to participate fully in the "Equity Resolution Process." They cannot present evidence except as a testifying witness and have no rights other than those bestowed on witnesses. The alleged victim

4

who is no longer the Complainant can be cross-examined by the accused but the victim cannot cross-examine the accused. The alleged victim can only be in the hearing room to testify so they cannot respond to the evidence presented by the accused. The accused can have an advisor present but any advisor for the victim must remain outside even during the victim's testimony. The alleged victim's right to appeal the decision of the hearing panel is also cut off by the University's decision to assume the status of the Complainant. *See* CRR 600.030(H), (J), and (L). There is evidence in the Record that would permit the jury to find that neither Plaintiff consented to the University taking over the role of the Complainant in the Equity Resolution Process.

### B. The Title IX Office Receives Reports of Alleged Misconduct by T.P. a Year Before His Alleged Harassment and Assault of Doe 1 and Doe 2

T.P. was a student at the University of Missouri Columbia, and a member of its men's basketball team.

In October of 2016, T.S., another student at the University, reported to the Title IX office that, on several occasions, T.P. had been violent towards her, chased her, grabbed her, pulled her out of her car, pinned her to the hood of her car, and threw her into her car, causing her to hit her head and then to fall to the concrete. *See* Doc. 135-2, pp. 1–2, SOF 4–6; Doc. 105-1, p. 25 (email summary of T.S.'s report to Title IX Office). T.S. provided the Title IX office with photos of her injuries, as well as a list of witnesses who could speak to T.P.'s conduct.

The Title IX Office acknowledged receipt of T.S.'s complaint and contacted her by phone the next day. T.S. met with the Title IX Office, but she was not comfortable with the University's contacting T.P. She said she reported T.P. so the Title IX Office would have the information in case someone else made a report against him. The Title IX Office offered T.S. interim measures, including a no-contact directive, but T.S. declined them. She asked the Title IX office not to

investigate further and requested that the Title IX Office not disclose her name, stating that "she d[id] not feel safe and fear[ed] for her safety if an investigation move[d] forward."

At the same time, T.S. reported that T.P. had raped one of her sorority sisters, J.K., and requested that the Title IX Office investigate. An investigator contacted J.K, who confirmed that T.P. raped her. However, at the time, J.K. chose not to make a formal report or move forward with the Title IX process. *See* Doc. 135-1, at 5 SOF A15–18;[4] Doc. 122-4 (email from J.K.).[5]

The Title IX Office met with T.S. again after speaking with J.K. At that point, the Title IX Office honored T.S.'s request that it not move forward with an investigation and that it keep the identities of T.S. and J.K. confidential. The University thus did not initiate an investigation into either T.S.'s or J.K.'s reports. The Title IX Office addressed the reports with T.P. only informally, telling him that there had been reports that he had engaged in conduct that may have violated the Student Standard of Conduct, and requiring T.P. to attend one in-person meeting with the Title IX Office. *See* Doc. 135-1, at 11 SOF B32–33.

### C. Doe 1 Reports T.P.

Doe 1 enrolled at the University in the Fall of 2013 and was an undergraduate student in Fall 2017. In a meeting with university staff at the beginning of the Fall 2017 semester, Doe 1 reported that, over the summer before the semester began, she was stalked and harassed by a

---

[4] Instead of sequentially numbering its Statement of Material Facts, the Defendant separates its material facts into sections, identified by a letter. The facts within each section are numbered, but the numbering starts at 1 at the beginning of each new section. Instead of renumbering the Defendants Statement of Facts or ordering the University to provide a new, sequentially numbered statement of facts, the Court will follow Defendant's citation convention. Hence the citation here to SOF B15–18, refers to facts 15–18 in Section B. For ease of reference, the Court will also include a citation to the page on which a fact can be found. The Plaintiffs did sequentially number their Statement of Additional Material Facts, and accordingly citations to that document will not include a letter reference.

[5] Both parties object that certain statements made to the Title IX Office reporting T.P.'s conduct are hearsay. However, the Court finds that those statements, like the one cited above, are offered not for the truth of the matter asserted, but rather to show the University's knowledge and the effect the statements had on the University.

student who also had sent her inappropriate text messages and pictures. Doe 1 did not name the student. This report was sent to the Title IX Office.

The same day that the Title IX office received the report—September 12, 2017—a Title IX investigator requested a meeting with Doe 1 and provided her information about her rights under Title IX and various other resources available to her. The next day, Doe 1 spoke with the Title IX Office by phone. She explained that, over the summer, harassment by a then-unnamed student athlete (later identified as T.P.) had been bad, but that after she moved apartments, blocked the individual from contacting her, and threatened a restraining order, the situation had improved.

Still, Doe 1 met with the Title IX Office a few days after submitting her report. During the meeting, Doe 1 confirmed that she met T.P. on April 8, 2017. *See* Doc. 135-1, at 18 SOF 17; Doc. 105-3, at 67–72 (summary of Title IX Office Interview with Doe 1). Doe 1 described the situation with T.P. as a "really fast interaction" that lasted a couple of weeks and "subsided" by May 2017. Doe 1 explained that she met T.P. because she waited on him, and several other members of the men's basketball team, while they were at the off-campus bar in which she worked. After their initial meeting, they began texting and spent some time together.

Not long after they met, T.P. began to send Doe 1 several long text messages proclaiming his feelings for her. Doe 1 did not reciprocate, and she asked T.P. to "slow it down," especially considering they had only known one another for a few days. *See* Doc. 105-3, at 68. T.P. also sent Doe 1 an unsolicited picture of his penis. T.P.'s texts continued—and escalated—and Doe 1 was forced to block T.P. from contacting her. She said, "I blocked his number from my phone, so he messaged me on Snapshot [sic] to ask me why I blocked him, so I blocked him on that, then he messaged me on Instagram, so I blocked him there, from my phone." Doc. 105-3, at 69. Even then, T.P. continued trying to reach Doe 1. Doc. 135-2, at 5 SOF 23–25. Doe 1 provided the Title

IX Office with text messages and screenshots to substantiate her allegations, including the photo she received from T.P. showing his penis.

Doe 1 also quickly began noticing T.P. "every day" at the off-campus bar at which she worked. She asked him to stop coming to her workplace. Nonetheless, he kept coming. He became friends with her bosses, came behind the bar, and sat in the manager's office while Doe 1 worked. *See* Doc. 105-3, at 68–69. Although Doe 1 told her bosses about T.P.'s behavior, they ultimately still hired him as a bartender because, as a member of the University basketball team, he would be good for business. Doc. 105-3, p. 69.

Doe 1 also reported that T.P. had seemed to obtain access to her class schedule and on one occasion approached her outside of her class. *See* Doc. 135-2, p. 5, SOF 26; Doc. 105-3, p. 70. Doe 1 had never seen T.P. around Columbia before; then, suddenly, she saw him frequently. Doc. 105-3, at 71. Doe 1 also reported that, at times, she felt like he was following her and intentionally driving past her car or apartment. Doc. 135-1, at 17 SOF 14; Doc. 105-3, at 69–70. She once saw T.P. parked in the parking garage outside of her apartment at 3 a.m.

Doe 1 approached T.P.'s teammates to ask them to convince him to leave her alone, but his teammates told her that they were aware of his behavior and that "[T.P.] is just like that with girls." Doc. 105-3, 136 182:-183:8. Eventually, Doe 1 was forced to threaten a restraining order.

Despite T.P.'s persistent behavior, Doe 1 told the Title IX Office that T.P. had never said anything "mean" or "scary" and he did not "feel like a physical threat." Doc. 105-3, at 71. Doe 1 also told the Title IX Office that the situation had been "resolved" and that she had not interacted with T.P. since the summer. Doe 1 initially did not want the Title IX Office to contact T.P. *See* Doc. 135-1, at 20 SOF 20; Doc. 105-3, at 68 and p. 103, 49:5–14 (Doe 1's deposition testimony confirming the accuracy of the Title IX Office's notes from her interview). Doe 1 declined interim

measures offered by the Title IX Office. Still, she believed that, by speaking to the Title IX Office, she was making a formal complaint. *See* Doc. 105-3, p. 105, 58:20–59:5 (deposition of Doe 1). Doe 1 agreed to receive electronic communications from the University to her University email address. *See* Doc. 135-1, at 16 SOF C9. However, when she left the University at the end of the semester she provided the University with her new email. She also provided the University a working telephone number.

Not long after, in October of 2017, the Title IX Office informed Doe 1 that it had independently identified the "student athlete" as T.P., and that, because there had been prior incidents, it may have to proceed with an investigation. The Title IX Office asked Doe 1 to provide information regarding the co-workers who had witnessed T.P.'s behavior. Doe 1 did not immediately respond, but after a follow-up email several weeks later, she apologized for missing the first email and indicated that she was more than happy to work with the Title IX Office. Doc. 105-4, at 66. Doe 1 never provided the Title IX Office with her co-workers' names, as she ultimately decided that her coworkers did not have relevant information. *See* Doc. 135-1, at 23 SOF C30.

The Title IX Office did not start an independent investigation or take any other steps at the time even though it was now aware that three women had reported either being stalked, raped or physically assaulted by T.P.

### D. Doe 2 Reports Misconduct

Doe 2, another student at the University, met T.P. during the Fall 2017 semester. The two originally connected on social media and hung out several times at Doe 2's off-campus apartment. Once, Doe 2 and T.P. studied together at the University's Student Center. On December 5, 2017, T.P. took Doe 2 and one of her friends to the bar at which he worked and made drinks for them.

9

Doe 2, who was under the legal drinking age, believes that at least one of the drinks was drugged, because she has few memories of that night. Doc. 135-2, at 8 SOF 38–40. She did not remember how she got undressed. She remembers waking up to T.P. videotaping her with his phone while raping her in her off-campus apartment. Doc. 135-2, at 8 SOF 41. She told him to stop. She then blacked out again. She remembers getting up to vomit, falling on the way to the toilet, and then vomiting. She remembers T.P. holding her phone in front of her face. T.P. tried to get Doe 2 to go back to bed, but she refused and just slept on her bathroom floor. Doc. 105-4, 77 31:20-33:2. At 1:13 p.m. the next afternoon, Doe 2 was still on her bathroom floor, unable to move. Doc. 105-4, p. 121.

On December 11, 2017, Doe 2 and her father filed reports with the Columbia Police Department ("CPD") and the Title IX Office. Doe 2 met with Title IX investigators in person, and provided a list of witnesses, including her roommate who was in the apartment with T.P. and Doe 2 during the incident. Doe 2's roommate received multiple Snapchats from T.P. requesting a threesome while he was in Doe 2's room the night of the alleged rape. At the time Doe 2 spoke with the Title IX Office, however, those messages were no longer recoverable. Later that night, Doe 2 submitted a formal complaint and authorized the Title IX Office to contact her witnesses and proceed with an investigation.

Doe 2 was under the impression that a no-contact order would be issued to T.P. the next day. But before the no-contact directive issued, T.P. attempted to contact Doe 2 through Snapchat. Doe 2 emailed the Title IX Office a copy of T.P.'s attempt to contact her on December 12, 2017. Still, the Title IX Office did not send the no-contact directive. T.P. again attempted to contact Doe 2 through Snapchat on December 13. The Title IX Office's Bailey Toulmin told Doe 2 that she

had not yet sent out the no-contact directive, but that she expected to send it by the end of the week.  Doc. 105-4, 85–86 64:18–69:5.

### E.  The University Launches Its Own Investigation

The day after Doe 2 made her report, December 12, 2017, CPD contacted the Title IX Office and asked that it delay its investigation into T.P., to ensure the University did not compromise an ongoing police investigation.  In the meantime, the Title IX Office discussed next steps and reviewed previous reports against T.P.  The Title IX Office also contacted T.S. and Doe 1 to inform them that there had been another report against T.P., and therefore the University may have to proceed with an investigation into their complaints.

While the Title IX Office was waiting for the go-ahead from CPD, on December 14, 2017, Doe 2 contacted the Title IX Office and asked that it hold off on contacting T.P. until she met with her counselor the following Monday. The University acknowledged her request and informed her that the Title IX investigation was already on hold pending the completion of the criminal investigation.  The Title IX Office told Doe 2 that it would check in with her regarding next steps after winter break.  Doe 2 agreed and went home for the break.

A few days later, on December 19, the Title IX Office spoke with Doe 2 and her father by phone to discuss next steps in the Title IX process.  The Title IX investigator mentioned that CPD was waiting for information from Doe 2 to move the criminal investigation forward, which was necessary before the Title IX investigation could begin.  Doe 2 and her father told the Title IX Office that they had not received any communications from CPD.  Doe 2 said that she was "over this" and "just done with this."  Doc. 105-3, p. 29, (Toulmin Dep. 96:14—25).  Her father told the Title IX investigator that Doe 2 was overwhelmed, and the Title IX investigator suggested speaking after the winter break.  *Id*.  Doe 2 said "that worked for her."  *Id*.  The Title IX investigator

did not believe Doe 2 wished to withdraw her complaint, or that Doe 2 did not want the investigation to proceed. Doc. 105-3, p. 30, 97:18–23.

A few days after the discussion with Doe 2 and her father, on December 22, CPD indicated that they had not heard from Doe 2 and gave the Title IX Office permission to move forward with its investigation. On January 4, 2018, the investigator who originally worked with Doe 2, Bailey Toulmin, told Doe 2 that CPD had indicated they had not heard from her and therefore they had not investigated the matter, and were no longer requesting the Title IX Office to delay its own investigation. The email to Doe 2 further stated:

> We plan to move forward with the formal complaint that you filed with our Office. The next step is to send a Notice of Investigation and No Contact Directive to Mr. ***** that requires him to meet with Investigator Diamond Scott to respond to the allegations. Investigator Diamond Scott will be investigating this matter moving forward as my last day at the University is on January 12, 2018.

Doc. 105-5, p. 11.

As the aforementioned email suggests, by January 15, 2018, a new investigator, Diamond Scott, had been assigned to Doe 2's case and all other matters involving T.P. When Ms. Scott spoke with Doe 2 and her father shortly after she took over, on January 15, Doe 2 stated that she was not ready to proceed as she was having a lot of anxiety about the situation. Doc. 135-1, at 37 SOF D41. She asked Ms. Scott if there was any deadline for her to decide when to pursue her complaint. Ms. Scott told her there was not. Ms. Scott also told Doe 2 that she would check in with her again in a couple of months. Doc. 105-4, 91–91 87:5–90:18.

Despite telling Doe 2 in mid-January that there was no deadline for her to decide how to proceed, and despite telling Doe 2 that she would check in with her in a couple of months to see if she was ready to pursue her complaint, Ms. Scott emailed Doe 2 on January 26, 2018, stating, in relevant part:

I am writing to inform you that based on additional information received by our Office, the University is proceeding with an investigation against [T.P.]. As someone who has previously reported incidents to our Office, your information will be included in this investigation. As has been discussed with you previously, we will use "Complainant A, B, C, etc." when referring to the information you've provided in any written documentation. Our Office, however, does not guarantee complete anonymity, and would provide identifying information directly to the Respondent if requested.

The Respondent will be notified today of my investigation. Your safety and wellbeing are important to us, and Andy Hayes, Interim Assistant Vice Chancellor & Title IX Administrator will also make a determination if any interim remedies are needed at this time to protect your safety, balanced with the Respondent's rights in the Equity Resolution Process. It is your right to be free of retaliation. Retaliation for making or supporting a complaint of discrimination is prohibited. Please let me know if you are concerned about retaliation.

Doc. 105-5, p. 132.

Although Ms. Scott's email to Doe 2 did not make it clear, between Ms. Scott's mid-January phone call with Doe 2 and the end of January, the University's Title IX Coordinator unilaterally decided that the University would take over as the "Complainant" for Doe 1 and Doe 2 in the Title IX proceedings against T.P. Doc. 135-1, at 38 SOF E2, 39 SOF E4, 40 SOF E5. By that time, Doe 1 had expressed reluctance to initiate an action and was not responsive to emails sent to an outdated email address, but Ms. Scott never attempted to contact Doe 1 at the email she had given when she left the University or the working telephone number she had provided and had not made a definitive decision. Doe 2 had also expressed reluctance to initiate an action, but never suggested that she did not want to proceed as a complainant. To the contrary, Doe 2, her father, and her roommate's father, were in regular contact with the Title IX office about the T.P. investigation. And, as stated above, very shortly before the University's decision was made, Ms. Scott told Doe 2 that there was no deadline for her to make a decision and promised that she would re-contact Doe 2 to discuss the matter further in a couple of months.

CRR 600.020(E)(2) permits the University to "initiate an investigation notwithstanding a Complainant's request that the Complaint not be pursued," but the decision must be "well-reasoned and documented." CRR 600.030(C)(2) also provides that the "Complainant" – which is defined as "the person alleged to have been subjected to discrimination" – has the choice to act in that role in the resolution process. However, "[t]he University may serve as the Complainant when the person alleged to have been subjected to discrimination, harassment or sexual misconduct . . . chooses not to act as the Complainant in the resolution process or requests that the Complaint not be pursued." It is not clear (and the parties do not address) whether the University first assumed the status as the Complainant before or after the investigatory stage; based on subsequent events a jury could find that the University assumed the role at the investigative stage and retained it through the Equity Resolution Process. Regardless (and more importantly), there is abundant evidence in the Record that would permit a jury to find that Plaintiffs never indicated that they did not want to serve as the Complainant, making the University's assumption of that role improper under CRR 600.030(C)(2). Moreover, although University policy provides that, where the University proceeds as formal complainant, "the Title IX Coordinator will inform the Complainant of the decision to commence an investigation," Doc. 105-1, at 10, the University did not tell either Doe when it assumed the role of a formal Complainant. Doe 1 was never informed about the change, and Doe 2 was informed less than three days before the May hearing.

By January 26, 2018, T.P. was notified of the Title IX investigation. As a result of the University's Notice of Investigation, the Title IX Office prohibited T.P. from traveling to or playing in a basketball game scheduled that day. Doc. 135-1, at 45 SOF E16–17. A few days later, the Title IX Office issued T.P. an interim suspension from the University, pending the outcome of the Title IX process. Doc. 135-1, at 46 SOF E19–21. T.P. was prohibited from using

University facilities, except for scheduled Title IX meetings. He therefore was prohibited from attending classes, being on campus, and playing basketball. His basketball scholarship for the Spring 2018 semester was cancelled.

Within several days of the University's beginning its investigation in late January 2018, five women, four of whom had never spoken to the Title IX Office, reported misconduct by T.P.[6]

- First, J.K., who had previously confirmed T.P. had raped her but declined to make a report, contacted Ms. Scott. She said, "I was previously contacted by the Title IX office and asked if I wanted to pursue a case against T.P. after he raped me July 23rd, 2016. I confirmed with the office it was true, but that I didn't want to move forward with the case. If my story will help with the investigation, then I am more than willing to come forward now." At Ms. Scott's request, J.K. met with the Title IX Office the next day. J.K. stated, however, that she did not want to be part of the case. Doc. 135-1, at 48 SOF F5.

- Second, S.K. contacted Ms. Scott after receiving her information from T.S. She reported that in December 2016, T.P. asked her to send him naked pictures and "begged" her to have sex. He also asked her if she had ever recorded herself having sex. About a month later, S.K. asked T.P., who was sober, for a ride home because she was drunk. That night, they had sex, though S.K. stated that she was too intoxicated to have been able to consent. S.K.'s friend, who was also in the apartment, saw flashes from under the door. Unbeknownst to S.K., T.P. was recording the encounter. S.K.'s friend confronted T.P. and made him delete the videos in front of her. Ms. Scott met with S.K. several days after she made the report. Doc. 135-1, at 49 SOF F10-11.

- Third, A.M. emailed Ms. Scott indicating that she and several of her friends had "unpleasant encounters" with T.P., and she asked whether she could do anything to help the investigation. Doc. 135-1, at 50 SOF F13. Ms. Scott met with A.M. a few days later. A.M. had class with T.P., and the two eventually connected on social media. T.P. insinuated that he wanted to have sex with A.M., and when she repeatedly refused him, he became mean. Doc. 105-7, at 1. One day, he sat directly next to her in class but did not speak to her. It stuck out to A.M. because there were many other seats available.

- Fourth, A.A. submitted an online Title IX report indicating that T.P. had once recorded a sexual encounter with A.A. without her knowledge or consent. T.P. sent her the video, but she had since deleted it, because she did not want it on her phone. Ms. Scott attempted to meet with A.A., but A.A. never responded to Ms. Scott.

---

[6] It is not clear from the current record whether the University had learned of these additional incidents of sexual harassment by T.P. before or after T.P. was issued an interim suspension.

- Fifth, D.B., who had been in a relationship with T.P. in 2016, made a report to the Title IX Office stating that, once, T.P. insisted that they have sex, and that he ignored D.B. when she said no multiple times. Eventually, D.B. agreed. D.B. told Ms. Scott that she did not "wish to push the issue nor [did she] care to be involved beyond this point." Doc. 135-1, at 53 SOF F25. Ms. Scott followed up with D.B., but D.B. did not respond.

By February 1, 2018, the University was aware of a total of eight complainants, together alleging at least three separate sexual assaults, three separate recordings of sexual activity without consent, two incidents of domestic assault, and two incidents of stalking by T.P. In light of the new allegations, the University prepared an amended Notice of Investigation, listing five of the complainants, identified as Complainants A through E. However, the University was still proceeding as the formal "Complainant" under the University's Title IX policy. Therefore, under the policy, none of the victims were "parties"; T.P. alone was a party to the Title IX proceedings.

During the formal investigation into T.P., Ms. Scott reviewed internal logs of prior meetings with the victims, emails, and prior interview statements of T.S., Doe 1, and Doe 2. She also attempted to contact each of the additional women who reported misconduct after the investigation began, and interviewed J.K., S.K., and A.M. (As for Doe 1, however, Ms. Scott only ever attempted to contact her at her outdated University email address, although Doe 1 had expressly asked the Title IX Office in January 2018 to contact her at a different email account because she was no longer attending the University.) Ms. Scott obtained witness statements from J.B. and S.D.—both of whom were identified as witnesses by the first complainant, T.S.—and A.S., the friend that saw camera lights from under S.K.'s door.

Although Doe 2 and her father reached out to Ms. Scott several times, Ms. Scott never attempted to take a statement directly from her (despite Doe 2's offer to provide one), and did not contact her witnesses (despite Doe 2's asking whether she had, and despite the fact that the father of Doe 2's roommate, one of her witnesses, had reached out to the Title IX Office directly to look

into the status of the investigation). For example, in a March 12 and 13, 2018 email exchange, Doe 2 asked Ms. Scott, "Just wondering if you have talked to my witnesses that I gave you. I was never talked to again about the night after my initial report." Ms. Scott's response was: "I've interviewed or have been given statements by a number of witnesses with firsthand knowledge of the alleged incidents. . . . We had all the information needed from your original report, and additional meetings were not needed at this point in the process." Doc. 105-7, p. 79. Ms. Scott's representation that she had spoken with witnesses regarding Doe 2's allegations was false. Ms. Scott also chose not to attempt to retrieve a surveillance video about which Doe 2 had expressly asked.

In contrast with her decision not to interview most of the complainants and their witnesses, Ms. Scott interviewed T.P. and spoke with both him and his advisor at various points during the investigation. By Ms. Scott's own estimate, she had more communications with T.P. than with all the complainants who were involved. T.P. also was provided the opportunity to respond to the allegations made against him.

Ms. Scott prepared an investigative report for the Title IX Coordinator that included the background information and a summary of the allegations made by several victims and by T.P., and some evidence submitted to the Title IX Office over the course of the investigation. The report included allegations from T.S., Doe 1, Doe 2, A.M., and S.K.

However, while the report makes passing reference to T.P.'s alleged sexual assault of J.K. when discussing T.S., J.K. is not identified by name or listed separately as a "Complainant," nor does the report mention that Ms. Scott spoke with J.K. *See* Doc. 105-7, at 20 (Ms. Scott's investigative report). In fact, in January 2018, J.K. provided Ms. Scott with a detailed report concerning the sexual assault. According to J.K., while he was and remained fully sober, T.P.

gave her alcohol at a concert in Kansas City, and then drove her to a large warehouse parking lot somewhere between Kansas City and Columbia.  There were no cars and no people around.  Her phone had died.  He repeatedly tried to touch her, and she repeatedly told him to stop.  She started crying.  He told her that if it did not happen, he would leave her there without her phone, surrounded by woods.  He carried her out of his car, put her on the hood of his car, and raped her.  She asked if he was wearing a condom, and he said he wasn't.  She cried for the duration and after.  When he was finished, she slid off the car onto the gravel.  On the drive home, as she kept crying, he asked her what was wrong with her.  He was insisting on going to her apartment with her, but to her relief, he dropped her off in order to give a friend who had called him a ride home.  He tried to call her a half an hour later.  Terrified, she did not answer, pretending to be asleep.  When J.K. subsequently communicated to T.P. that what happened that night was not ok, he insisted that it was consensual.  He continued to harass her until she messaged him that it was sex that she "regretted," even though she knew it was "completely violent in the mo[]ment."  Doc. 105-6, pp. 19–21; *see also* Doc. 105-5, 53–54 (Hayes' Dep., 165:5-171:9).  While J.K. expressed reluctance to be part of the case, other complainants who had similarly expressed reluctance nonetheless were included amongst the unidentified "complainants."

Ms. Scott also did not include allegations by A.A., who had alleged that T.P. had recorded a consensual sexual encounter with her without her knowledge or consent, or D.B., who had alleged that T.P. had once insisted that they have sex, ignoring D.B.'s multiple refusals.

In contrast with her decisions to not include all complainants, even those with extremely serious allegations, and to not include all complainants' witnesses, Ms. Scott included in her report T.P.'s response to each victim's allegations as well as two character witness statements provided

on his behalf. The report also does not mention a fact that Ms. Scott shared with Doe 2: that Ms. Scott had asked to look at T.P.'s phone, but he refused to permit it.

Ms. Scott did not include in the report any information from the witnesses provided by Doe 2, with whom she never spoke. *See* Doc. 105-5, at 38 (Hayes Dep., 107:3-25) (Title IX Coordinator explaining that Doe 2's witnesses were never contacted, and the decision was left to Ms. Scott's discretion). Ms. Scott later claimed that she did not contact the witnesses that Doe 2 herself had identified because she did not think they had firsthand information, despite the fact that at least one of the witnesses was Doe 2's roommate, whom T.P. messaged the night of the alleged sexual assault, inviting her to join for a threesome. Ms. Scott also thought she had enough evidence (though the hearing panel would later question why Ms. Scott did not collect more evidence) and she wanted to protect Doe 2's privacy (although Doe 2 and her father had specifically questioned why she had not spoken with her witnesses, and her roommate's father himself had reached out to the Title IX office about its failure to contact his daughter).

On March 12, 2018, Ms. Scott submitted her report to the University's Title IX Coordinator for review and approval. A few weeks later, the Title IX Office concluded there was enough evidence to proceed on four of the five complaints: those involving T.S., Doe 1, Doe 2, and S.K., who had complained of nonconsensual sex and videorecording. The fifth complainant, A.M., was informed that there was insufficient information to indicate a violation of the University's policies in her case. J.K., the first woman who had reported the T.P. had raped her more than a year before the Doe incidents, was not even mentioned in this report and the University did not make a formal complaint based on J.K.'s information.

## F. The Title IX Office Prepares for the Resolution Process

In early April 2018, Ms. Scott notified T.P. and the four complainants whose cases remained—including Doe 1 and Doe 2—that their complaints were moving forward to the resolution phase of the University's Title IX Process. Ms. Scott explained that each victim would have the ability to review her written statement, which would be included in the final investigative report. She did not, however, explain that the University was proceeding as the formal complainant or that the University considered the victims to be only witnesses. *See e.g.*, Doc. 105-8, at 1–3 (emails sent from Ms. Scott to several victims).

Since the University considered only T.P. to be a party, he alone was permitted to choose the process he preferred. On April 10, he chose to proceed before a hearing panel. Doc. 105-8, at 6.

University policy permits presentation of evidence showing "a pattern of related misconduct." *See* CRR 600.030(N)(3)(c) ("Incidents or behaviors of the Respondent not directly related to the possible violations will not be considered unless they show a pattern of related misconduct. History of the related misconduct by the Respondent that shows a pattern may be considered only if deemed relevant by the decision maker."). The sexual assault of J.K. and the nonconsensual videotaping of sexual acts with A.A. had been excluded because they were not included in Ms. Scott's investigative report. Even among the remaining complainants, the allegations by S.K. (who said she was too intoxicated to consent to sex and whose friend noticed T.P. videotaping or photographing the sexual encounter) and the allegations by Doe 2 were sufficiently similar to constitute related misconduct. Nonetheless, the University's Title IX Coordinator, "in consultation with appropriate University personnel," decided that "it was appropriate to conduct four separate hearings regarding the allegations" concerning T.P. because the University "did not believe the allegations from the four women were sufficiently related to be

20

considered in the same hearing." Doc. 135-1, at 60 SOF H4. No hearing panel member was informed about the multiple, independent (yet similar) reports of T.P.'s sexual misconduct.

The University began scheduling hearing panels. On April 30, 2018, nearly a month before the hearings, Ms. Scott informed T.P. and his advisor of the potential hearing dates. Plaintiffs were not advised of the hearing dates at this time.

Between April and May 2018 Doe 2, her father, and Doe 2's roommate's father all contacted the Title IX Office to inquire about the status of the T.P. investigation. Doc. 135-2, at 14 SOF 73. Doe 2 and her father asked several times if Mr. Scott needed to re-interview Doe 2 and questioned why Ms. Scott had not contacted Doe 2's witnesses. Doc. 135-2, at 14 SOF 73–74. The father of Doe 2's roommate expressed concern at the quality and pace of the investigation.

About a month after informing Plaintiffs that their complaints were proceeding to the resolution process, around May 3, Ms. Scott sent them copies of their statements and asked them to review and propose any changes within 24 hours. Doc. 105-8, at 12. Plaintiffs did not know that the hearings in their cases were still weeks away.

On May 22, several weeks after informing T.P. of hearing dates, and just two days before the hearing on Doe 1's allegations and three days before the hearing on Doe 2's allegations, Ms. Scott emailed the women to inform them, for the first time, that T.P. was proceeding by hearing and when their individual hearing was scheduled. Ms. Scott emailed Doe 1 at her University email account, which meant that she did not receive any notice before the hearing.

The May 22 emails were the first time that Ms. Scott explained, though she claims she thought the victims had previously understood, that the University, and not any victim, was the formal Complainant. *See, e.g.*, Doc. 105-8, at 17; Doc. 122-15, at 51 (Scott Dep., 201:1–11). Ms. Scott also "wanted to highlight" that victims were not required to be present at the hearing, and

seemingly discouraged their presence, stating that, "in similar situations when the University is moving forward on behalf of a complainant, they would not be present." *Id.*

On May 23, 2018, Ms. Scott told Doe 2 and her father that Doe 2 would have (1) the right to be present at the hearing with an advisor, (2) the ability to ask questions of T.P. and other witnesses, and (3) the right to present evidence. Later that same day, however, Ms. Scott retracted her statements, explaining that because the University was the Complainant, Doe 2 (1) could attend the hearing only as a witness to provide a statement on her own behalf; (2) would not be permitted to remain in the room except during her own testimony; (3) would not be permitted to question T.P.; (4) T.P. would be able to cross-examine her; and (5) any advisor Doe 2 brought would have to wait outside of the hearing room.

The victims did not attend the hearings. Doe 2 specifically stated, "I did not go to the hearing but I -- because I went based off of [Ms. Scott's] highlighting that I typically would not be present." Doc. 105-4, 99 120:10–16.

### G. The Hearings

At the hearings, Ms. Scott, saw her role as that of "neutral investigator". Therefore, she did not speak or argue on behalf of the victims, including when T.P. testified and offered new evidence. *See* Doc. 135-2, at 23 SOF 128; Doc. 135-2, 18 SOF 96. Indeed, the University always sees its role as neutral investigator, even when it proceeds as the formal Complainant on behalf of a victim. Doc. 105-5, at 75 (Hayes Dep., 254:2–13). Yet, there is nothing in the Record to suggest Doe 1 and Doe 2 or any other complaint was ever told that no one at the hearings would be protecting their interests or otherwise attempting to convince the panels that T.P. engaged in misconduct. While the victims' statements that were presented to the panel at times refuted T.P.'s statements, the victims were not allowed to review T.P.'s original statement, so they had no way to address

T.P.'s responses. Doc. 122-15, at 56 (Scott Dep., 222:4–20). Indeed, Doe 2 insists that T.P. fabricated two conversations he claimed he had with her, which were submitted to the hearing panel. Doc. 105-4, 97–98 (Doe 2 Dep., 113:6–116:8).

Despite telling Doe 2—and all the victims—that their presence at the hearing would be unusual because the University was proceeding as the "Complainant," Ms. Scott told Doe 2's hearing panel that, "[t]ypically, in situations where there is a named complainant . . . they would be here today, and that is not the case." Doc. 135-2, 18 SOF 99. Ms. Scott described Doe 2 as "a reluctant Complainant" and, despite the multiple attempts by Doe 2, her father, and her roommate's father to reach out regarding her complaint, Ms. Scott told the hearing panel that, "[a]fter her initial complaint . . . she has not [had] much interaction." *Id.*, 18 SOF 97. The University now acknowledges that, to the contrary, Doe 2 had been "cooperative" and "overall responsive." *Id.*, 18 SOF 98.

Similarly, Ms. Scott described Doe 1 to the hearing panel as "not cooperative," but the University acknowledges that Doe 1 in fact was responsive to communications from Ms. Scott's predecessor, and only after Ms. Scott took over and began attempting to communicate with Doe 1 exclusively at her outdated University email address rather than the new email address Doe 1 had given the University, did Doe 1 cease to respond. Doc. 135-2, 19–20 SOF 105–106. Ms. Scott never attempted to contact Doe 1 by phone. Doc. 135-2, 14 SOF 72.

T.S.'s hearing panel found T.P. responsible for violating two University policies when he became violent with T.S. He was suspended from campus for nearly one year in total, beginning (retroactively) on January 30, 2018, and continuing through December 14, 2018.

Doe 1's panel found T.P. responsible for sending the photo of his penis to Doe 1, but not for stalking. The panel's finding resulted in a warning.

S.K.'s panel found T.P. not responsible for either sexual assault or recording the sexual encounter without permission.

Doe 2's panel also found T.P. not responsible for either sexual assault or recording the sexual encounter without permission. Doe 2's panel indicated that the decision was close, but that the lack of a statement from Doe 2's roommate and the fact that Doe 2 did not testify were weaknesses weighing against a finding of responsibility. Doc. 105-9, at 99. Doe 2's panel asked Ms. Scott why she had not collected more evidence to support Doe 2's claims. *See* Doc. 105-5, at 41, (Scott Dep., 118:23–119:16).

Ms. Scott explained in a later email that it was exclusively her decision whether, and which, additional witnesses would be contacted. She claimed that she did not need to speak to additional witnesses because she had enough evidence from Doe 2. Ms. Scott claimed she felt that Doe 2's initial reluctance to proceed and privacy interests counseled against contacting Doe 2's witnesses—despite the fact that Doe 2 had identified the witnesses and authorized the University to contact them, the witnesses had personally witnessed T.P.'s behavior, both Doe 2 and her father had questioned Ms. Scott as to why she had not contacted the witnesses, and the father of one of the witnesses had himself contacted the Title IX office to inquire as to and complain about the quality and pace of the investigation. *See* Doc. 105-8, p. 7 (email from Ms. Scott to Doe 2's father). Ms. Scott claimed that the ultimate decisionmakers—the panelists—could have requested more information if they felt they needed it to make an informed decision, but there is no evidence that Ms. Scott told the panelists that they could make such a request or that the panelists had reason to know they could further investigate the facts.

Had Plaintiffs been formal Complainants, they would have had the opportunity to appeal the hearing panels' decisions. As mere witnesses rather than Complainants, however, they had no such right.

### H. Aftermath

Doe 1, who told the Title IX interviewer in the fall of 2017 that she had only an online class and internship to complete and that she would probably graduate in December but expected to walk in May, was forced to drop out of school and not return to Columbia out of fear for her safety. She did not re-enroll at the University for the spring 2018 semester, and she has not completed her degree.

Doe 2 also did not graduate from the University. Despite always planning on attending the University, Doe 2 transferred to another school for the 2019/2020 school year, from whence it appears she graduated. Doc. 105-4, 73 (Doe 2 Dep., 16:20–25, 17:1, 11–17). T.P. was still on campus during Doe 2's last semester at the University.

On November 15, 2018, T.P. utilized social media to publicly shame all the victims who had come forward against him, including by posting, "[Doe 2] you can go fuck yourself."

## II. STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted); Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing a lack of any genuine issues of material fact. *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010). The party opposing summary judgment, however, "must set forth specific facts showing that there is a genuine issue of material

fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    DISCUSSION

Plaintiffs advance four theories under Title IX and one under Missouri contract law. The Court will address the Title IX claims first.

### A.  Title IX (Counts I, II, III, and V)

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Under the statute, a student has a private right of action against an educational institution that receives federal funds if it intentionally discriminates based on gender. *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979). A victim of student-on-student sexual harassment, including sexual assault, also has a private right of action for damages against an educational institution that receives federal funding if the educational institution is deliberately indifferent to known acts of student-on-student, sexual harassment. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641-43 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281–82 (1998); *see also Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992),

### i.    Count I - Deliberate Indifference Under Title IX

To succeed on a claim for deliberate indifference under Title IX, a plaintiff must show that an institution was (1) deliberately indifferent (2) to known acts of discrimination (3) which

occurred under its control.  *Davis*, 526 U.S. 643-44; *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003); *see also Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021)[7]  A plaintiff also must show that "the discrimination was so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school."  *Davis*, 526 U.S. at 650.  Finally, the deliberate indifference must "cause[] students to undergo harassment" or "ma[ke] them liable or vulnerable to it."  *Davis*, 526 U.S. at 645; *see also Ostrander*, 341 F.3d at 750.

There is sufficient evidence in the record for a reasonable factfinder to conclude that the first two factors are satisfied with respect to each Plaintiff.  Well before Doe 1 lodged a complaint, the University was aware of allegations that T.P. had physically abused one student and raped another student.  Yet, the University did not launch a formal investigation.  *Cf. id.* at 751 (noting, in finding lack of evidence of deliberate indifference, that "no female student had reported to MU allegations of sexual harassment or abuse committed by" the alleged attacker).  While the first two alleged victims did not wish to lodge formal complaints, the University had the ability to pursue an investigation into T.P. nonetheless (as in fact it later did, after the two Plaintiffs also lodged complaints).  Certainly, before the sexual assault of Doe 2, the University knew that T.P. had been accused by multiple women of serious sexual misconduct.  Nonetheless, the University did not launch an investigation until after Doe 2 had become the fourth complainant.  Given the seriousness of the first two complaints, and the fact that they were raised or substantiated by two different women, the Court cannot say as a matter of law that the University's decision to not formally investigate T.P. earlier was not "clearly unreasonable in light of the known circumstances."  *Davis*, 526 U.S. at 648.

---

[7] A plaintiff must make a threshold showing that the educational institution involved is a Title IX funding recipient. *Davis*, 526 U.S. at 642.  Here, there is no dispute that Title IX applies to the University.

However, to the extent that Doe 1 and Doe 2 are seeking to hold the University liable for not intervening sooner to stop T.P. from sexually harassing them, the Court finds that they have failed to establish the third element of their deliberate indifference claim. An educational institution will only be liable for third party harassment if it "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Ostrander*, 341 F.3d at 750; *see also Davis*, 526 U.S. at 645-46. The University argues that none of T.P.'s harassment with respect to the Plaintiffs occurred on campus or in another location substantially under the University's control. Almost every interaction Plaintiffs had with T.P. occurred off campus. Doc. 135-2, at 5 SOF 22–26, 6 SOF 27, 8 SOF 38–41. Doe 2 stated that she once met T.P. on campus, but "[n]othing happened." *See* Doc. 105-4, at 122. Doe 1 testified that T.P. at least once waited outside of her classroom, even after she told him to leave her alone, Doc. 105-3, p. 104, 54:9–25, but one incident of this nature is insufficient to be severe and pervasive.

Plaintiffs argue that the University had control because it had the power to discipline T.P. through the Title IX grievance process. However, the Supreme Court has specified that the control required to succeed on a deliberate-indifference claim must be "over *both* the harasser and the *context* in which the known harassment occurs." *Davis*, 526 U.S. at 630 (emphasis added). It is not enough that the university's deliberate indifference "either directly cause[d] the abuse to occur or ma[d]e students vulnerable to such abuse"—in addition, "that abuse 'must take place in a context subject to the [university's] control.'" *Ostrander*, 341 F.3d at 750 (quoting *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001)); *see also Davis,* 526 U.S. at 645; *Roe v. St. Louis Univ.*, 746 F.3d 874, 882 (8th Cir. 2014). Case law has consistently held that peer to peer sexual harassment that occurs off campus is not "under the control" of the University, unless it is at an off-campus facility under the control of the university, *see Wreckhorst v. Kansas State Univ.*, 241

F. Supp. 3d 1154, 1167-68 (D. Kan. 2017) (off-campus fraternity house), or during an off-campus activity facilitated by a university, *see Simpson v. University of Colorado*, 500 F.3d 1170, 1177 (10th Cir. 2007) (recruiting activities off campus). Thus, even though the University has very close control over its student athletes, whose future financial success in sports may be at stake, the Court cannot find that the third element of Plaintiffs' deliberate indifference claim is supported by the evidence in the record. Therefore, the University is entitled to summary judgment on Count I, insofar as that claim pertains to the University's conduct preceding Plaintiffs' reports to the Titile IX office about T.P.'s harassment.

However, Plaintiffs have also asserted a claim for deliberate indifference based on the way in which the University handled their complaints *after* the University was told about T.P.'s harassment of Doe 1 and Doe 2. "An institution is deliberately indifferent when its 'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Shank*, 993 F.3d at 573 (quoting *Davis*, 526 U.S. at 648).

A reasonable factfinder could find ample evidence supporting a deliberate indifference claim in the context of the University's response to the reports by Doe 1 and Doe 2. While some of these irregularities in isolation would not make a submissible case, the totality of the evidence could readily lead a reasonable juror to find that the University was deliberately indifferent to Plaintiffs' complaints. Among the strongest facts supporting Plaintiff's position are the following:

- The circumstances surrounding the University's assumption of formal "Complainant" status in the cases—which itself was an unusual step.

    - Per University policy, the decision to proceed as the Complainant (at the investigation stage, and likely for the entire process) "should be well-reasoned and documented." CRR 600.020(E)(2). Yet, the University did not document its decision or explain its reasoning. *See, e.g.*, Doc. 105-5, at 17 (Hayes Dep., 22:5–12 (Title IX coordinator stating decision was only documented in the conversations the Title IX Office had with students).

o The University chose to take over as the Complainant despite (1) not making a fair effort to communicate with Doe 1, (2) Doe 2's cooperation and obvious interest in pursuing her case, and (most importantly), (3) neither Plaintiffs' expression of a desire to not serve as the Complainant.

o Doe 2 and others acting on her behalf reached out to the Title IX office multiple times to try to press for more investigation, but to no avail.

o The decision to proceed as formal complainant stripped Plaintiffs of rights they otherwise would have had, including the right to testify freely before the panel, be accompanied by an advisor, to cross-examine T.P., and to appeal the hearing panels' decisions.

o The University did not inform Plaintiffs of the ramifications of its decision to proceed as formal Complainant. Indeed, apparently, Ms. Scott herself thought the plaintiffs were proceeding as "Complainants" as late as May 23, 2018, three days before the hearing in Doe 2's case. Doc. 122-23 (email from D. Scott to Doe 2).

o The record does not indicate that the University ever informed Doe 1 and Doe 2 that if the University was the Complainant, it would stand neutral at the hearing and there would be no one there to advocate for them.

- Inadequate investigation.

  o Despite Doe 2's expressly identifying witnesses and later asking Ms. Scott to interview them, Ms. Scott did not do so. Instead, she said, "I've interviewed or have been given statements by a number of witnesses with firsthand knowledge of the alleged incidents"—which was apparently a lie. Ms. Scott later claimed she did not contact the witnesses to protect Doe 2's privacy, but this claim is belied by Doe 2's and Doe 2's father's repeated attempts to push the investigation forward and the fact that the father of Doe 2's roommate (one of the witnesses Doe 2 had identified) had reached out to the Title IX Office to complain about the slow pace of the investigation. Ms. Scott also claimed that the witnesses did not have firsthand knowledge of the sexual assault, but Doe 2's roommate not only was in the next room when the alleged assault took place, but also received Snapchat messages from T.P. during the assault asking her to join for a threesome. The fact that Ms. Scott first lied about securing witness statements and then proffered an arguably false rationale for her failure to interview key witnesses raises serious doubts as to her motivation.

  o Notice of the hearings. The University's conduct in advance of the hearing towards the Plaintiffs, in contrast with its conduct toward T.P., raises the reasonable inference that University officials discouraged Plaintiffs from participating in the hearings.

o   While T.P. received multiple weeks' notice of the hearings, the University did not give Doe 1 any actual notice of the hearing, or her limited rights with respect to it.

o   The University gave Doe 2 just three days' notice of the hearing. Moreover, Ms. Scott first told Doe 2 that she would be able to participate in the hearing, cross-examine T.P., and have an advisor at her side to offer support. Later the same day, Ms. Scott emailed Doe 2 to say:

> Following our conversation, I was able to discuss with my supervisor what your role would look like in the hearing if you decided to appear. As the University is the Complainant in this process, your role would be that of witness and not a party, which does limit a couple of things. You would only be present during your testimony, not the entire hearing. We also don't allow witnesses to have an advisor. You could, however, have someone else in attendance for support, but they would be asked to wait outside of the hearing room. Lastly, witnesses cannot directly question the Respondent or Investigator, but may be questioned by the panel and any party.

- Conduct During the Hearings

o   The hearing panels were not advised that the University had chosen to proceed as the formal Complainant, meaning that Plaintiffs were not permitted to be more involved in the presentation of the cases.

o   Ms. Scott suggested to the panels, several times, that the plaintiffs were uncooperative and uninvolved with the Title IX process.

▪   Ms. Scott misrepresented Doe 2's interactions with the Title IX Office. Doe 2 and the Title IX Office were in regular contact, and Ms. Scott spoke to Doe 2 just three days before the hearing. Not only did Doe 2 contact the Title IX Office several times in the months leading up to the hearing, so too did her father and her roommate's father. Each time, Doe 2 and those associated with her asked the Title IX Office about the case against T.P., whether additional statements or evidence was necessary, and why the Title IX Office was not doing more.

▪   Ms. Scott made no meaningful attempt to contact Doe 1. She made not a single telephone call to Doe 1 and continued to email her at her University account despite the fact that Doe 1 was no longer enrolled at the University and had requested in January 2018 that the Title IX Office contact her at a different email address.

- o Despite her own communication failures, Ms. Scott suggested to the hearing panels that the plaintiffs, rather than the Title IX Office, caused the weaknesses in the case against T.P.

- o Ms. Scott also advised the hearing panels that it was unusual for the complainants not to attend the hearings—when she herself had taken steps to discourage their attendance at the hearings.

- The University received reports of T.P. harassing female students more than a year before T.P. was accused of harassing Doe 1 and raping and recording his rape of Doe 2. Specifically, the University received reports of similar by T.P. from T.S. and J.K. Neither woman wanted to pursue complaints against T.P. arguably because of their fear of the consequences, and the University chose not to take over the role of the complainant in these cases. Yet when Doe 2 expressed a desire to pursue a complaint, the University (with little notice) took over the role of Complainant, thereby preventing her from being the Complainant and limiting her involvement in the process.

- After an investigation of the Doe complaints were initiated, other women were identified who claimed they had been harassed by T.P. Prior to the Doe hearings the University was aware of at least eight separate women who accused T.P. of sexual harassment, including three separate sexual assault, three separate recordings of sexual activity without consent, two incidents of domestic assault, and two incidents of stalking by T.P. While the University elected to pursue most of these claims, it inexplicably did not even discuss in its report, T.P.'s rape of J.K. almost a year before the rape of Doe 2.

The University argues that the Eighth Circuit's opinion in *Shank* demonstrates that Plaintiffs cannot establish deliberate indifference on the current Record. Specifically, the University argues that, here, as in *Shank*, "the University informed Plaintiffs about the Title IX Equity Resolution Process and their rights and option to file a complaint; informed Plaintiffs of the University's decision to proceed as the formal 'complainant' beforehand; provided Plaintiffs with repeated updates and notices regarding steps in the process; and permitted Plaintiffs to appear during the hearing to present their allegations to the panel, but Plaintiffs chose not to do so."

*Shank* is distinguishable in numerous respects. A reasonable juror could find that the University usurped Plaintiffs' status as the Complainant, did not attempt to inform Doe 2 of this decision until three days before Doe 2's hearing and seems not to have informed Doe 1 at all, even

though the decision to do so had been unilaterally made long before according to the University. Doc. 122-23 (email from D. Scott to Doe 2). This occurred even though Doe 2 and her family were actively communicating with the University and expressing concern about the progress of the investigation and even though Doe 2 did not indicate she agreed to give up her status as a complainant. In fact, she asked if there was a deadline for her to pursue her complaint and was told no and that the matter could be discussed again in a couple of months, but shortly after this assurance the University took over the role of Complainant without telling her of the decision or its consquences. In contrast, in *Shank* the college initiated its own complaint when the alleged victim remained reluctant to file complaint and specifically stated that she would "allow the administration to decide how to properly respond to the information" contained in her written, informal statement. Nor is there evidence that the educational institution in *Shank* remained neutral at the hearing and indeed in that case the hearing panel credited the evidence presented by the accuser.

Further, construing the evidence in the light most favorable to Plaintiffs, the University provided Doe 1 with no updates or notices regarding its process, and effectively ignored the many attempts by Doe 2, her father, and her roommate's father to understand how the investigation was unfolding and why the investigator had not spoken directly with Doe 2 or contacted Doe 2's witnesses. Indeed, a juror could find that the investigator outright lied about speaking with witnesses with firsthand information concerning Doe 2's allegations. A jury could also find that the investigator told Doe 2 it was not "normal" for a complainant to attend the hearing and then made the opposite statement to the hearing panel by relating that in similar cases a complainant would be present at the hearing. The University also told the hearing panel that Doe 2 was a reluctant complainant and did not have much interaction with the Titile IX office, even though the

University now acknowledges that that Doe 2 was cooperative" and "overall responsive". The University also told Doe 1's hearing panel that she was an uncooperative participant even though Doe 1 cooperated up until the time she left school and was never again contacted by the Title IX office at the phone and e-mail she had provided. In contrast, there was no evidence in *Shank* that the college discouraged the alleged victim from attending the hearing, misrepresented the procedures to either the student or the hearing panel, or engaged in any of the other actions described herein.

While these facts support a finding of deliberate indifference by the University, this does not end the *Gebser*/*Davis* analysis because *Davis* also requires that the deliberate indifference "cause students to undergo harassment *or* make them liable or vulnerable to it." *Davis*, 526 U.S. at 644-45 (cleaned up) (emphasis supplied). Thus, *Davis* specifically posits two distinct avenues of potential liability for a school: a plaintiff must prove that the school's deliberate indifference (1) caused them to be harassed *or* (2) made them vulnerable to harassment. The second clause would be a nullity if plaintiffs can prevail only by demonstrating subsequent harassment from the perpetrator, and the Court declines to interpret *Davis* in that manner. This interpretation is further supported by Title IX's language, in that a school's deliberate indifference which makes a student vulnerable to sexual harassment can result in denying that student the benefits of education and other activities offered by the school.

The First Circuit engaged in a similar analysis and held that *Davis* establishes "that funding recipients may run afoul of Title IX not merely by causing students to undergo harassment but also by making them liable or vulnerable to it." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009) (cleaned up). Under the latter theory, "a single instance of peer-on-peer harassment theoretically might form a basis for Title IX

liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity." *Id.* at 172-73. While such cases might not occur frequently, they could arise if "post-notice interactions between the victim and the harasser [are] alleged." *Id*. at 173 & n.3.

The Tenth Circuit addressed the same issue in a case in which students alleged they were raped by another student and the school's response evinced deliberate indifference. *Farmer v. Kansas State Univ.*, 918 F.3d 1094 (10th Cir. 2019). The school contended that "each Plaintiff must allege, as an element of her Title IX claim, that [the school's] deliberate indifference caused her to be subjected to actual further sexual harassment by a student." *Id*. at 1102. The students countered that it was "sufficient for them to allege that [the school's] deliberate indifference made them 'vulnerable to' harassment." *Id*. The Tenth Circuit agreed with the students, holding that "[t]he Supreme Court, in *Davis*, has already answered the legal question," *id*. at 1103, and the plaintiffs did not need to plead or prove they subsequently suffered actual harassment. Instead, they could prevail if they demonstrated that the school's deliberate indifference made them vulnerable to harassment. *Id*. at 1103-04.

The Fourth Circuit has also interpreted *Davis* as creating two avenues of liability, "agree[ing] with the First and Eleventh Circuits that a school may be held liable under Title IX based on a single, pre-notice incident of severe sexual harassment, where the school's deliberate indifference to that incident made the plaintiff more vulnerable to future harassment, or otherwise had the combined systemic effect of denying equal access to a scholastic program or activity." *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 274 (4th Cir. 2021) (cleaned up). The court observed that this interpretation is consistent with Title IX's language and purpose and concluded "that a school may be held liable under Title IX if its response to a single incident of severe sexual

harassment, or the lack thereof, was clearly unreasonable and thereby made the plaintiff more vulnerable to future harassment or further contributed to the deprivation of the plaintiff's access to educational opportunities." *Id*.[8]

Defendant contends that, in *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1084 (8th Cir. 2017), the Eighth Circuit adopted a different interpretation of *Davis*, one that requires Plaintiffs to prove they were subjected to actual harassment as a result of the school's deliberate indifference. Doc. 181, pp. 3-4. The Court does not agree with this interpretation of *K.T.* In that case, the plaintiff was a high school student who alleged she was sexually assaulted while visiting the campus as a potential soccer recruit. *K.T.*, 865 F.3d at 1056. The court assumed for the sake of argument that the plaintiff's status as a non-student did not preclude her from asserting a Title IX claim, *id*. at 1057, and then considered whether the school's alleged deliberate indifference was actionable. The plaintiff alleged that the school "was deliberately indifferent by failing to adopt practices to prevent sexual assault and also failing to investigate and offer medical services to" the plaintiff, but this deliberate indifference (if that is what it was) was held to not have caused the harassment of plaintiff. *Id*. at 1058. The Eighth Circuit did not consider whether the school could be liable for making the plaintiff vulnerable to future harassment; this is not surprising because the plaintiff was not a student at the school, so the school could not make her vulnerable to future harassment and any discussion of the issue was unnecessary. The court of appeals simply had no reason to discuss the possibility given the facts in *K.T.*

*Shank* provides additional justification for rejecting Defendant's interpretation of Eight Circuit precedent. There, the Eighth Circuit acknowledged that *Davis* presents two possible bases

---

[8] Other cases utilize the same analysis. *E.g., Williams v. Board of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1298-99 (11th Cir. 2007); *Doe v. Brighton Sch. Dist. 27J*, 2020 WL 886193, at *6-7 (D. Col. Feb. 24, 2020); *Doe 1 v. Howard Univ.*, 396 F. Supp. 3d 126, 135 (D.D.C. 2019); *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 660 (W.D. Tex. 2017).

for liability when it said "[c]ritically, the institution's deliberate indifference must cause students to undergo harassment or make them liable or vulnerable to it." *Shank*, 993 F.3d at 573 (citing *Davis*, 526 U.S. at 645 and *Ostrander*, 341 F.3d at 750) (cleaned up). Based on *Davis*, *Shank*, and other cases, several district courts in this circuit have similarly held that a Title IX plaintiff must demonstrate that the school's deliberate indifference (1) caused subsequent harassment or (2) made the plaintiff more vulnerable to harassment. *E.g., Nissen v. Cedar Falls Comm. Sch. Dist.*, 2022 WL 873612, at *8 n.11 (N.D. Iowa Mar. 23, 2022); *Doe v. Board of Trustees of Nebraska State Colleges*, 2021 WL 2383176, at *4 (D. Neb. June 10, 2021).

Defendant also relies heavily on the Sixth Circuit's decision in *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613 (6th Cir. 2019), but it is not clear whether or to what extent *Kollaritsch* is different from the Court's holding here. In *Kollaritsch*, the Sixth Circuit held that *Davis*'s two alternatives are "actually two possible ways that the school's 'clearly unreasonable' response could lead to further harassment: that response might (1) be a detrimental action, thus fomenting or instigating further harassment, or it might (2) be an insufficient action (or no action at all), thus making the victim vulnerable to, meaning unprotected from, further harassment." *Kollaritsch*, 944 F.3d at 623. The Sixth Circuit then held the plaintiffs had not alleged the school's actions made them more vulnerable or that the harasser even contacted them after the harassment was reported. *E.g., Kollaritsch*, 944 F.3d at 625.[9] A later decision further suggests the Sixth Circuit may not be the outlier that the parties believe it is. In that case the Sixth Circuit held the plaintiffs' claim that the school's response was inadequate was asserting "a

---

[9] *Kollaritsch*, 944 F.3d at 625 ("At no point after the initiation of MSU's response did that male student have any contact with or commit any *further* harassment of Gross . . . . Gross did not plead any facts that would show any post-response encounter . . . ."); *Kollaritsch*, 944 F.3d at 625 ("At no point after the initiation of MSU's response did the male student have any contact with or any further harassment of Roe 1 . . . . She did not plead any facts that would show any post-response encounter, much less any further sexual harassment that was actionable.").

drastically different theory of Title IX liability than was asserted in *Kollaritsch*" and to hold that a school "is immune from liability as long as no student is assaulted twice, regardless of its indifference to widespread instances of sexual harassment across its schools, would defeat Title IX's purpose of eliminating systemic gender discrimination from federally funded schools." *Doe v. Metropolitan Gov't of Nashville & Davidson County, TN*, 35 F.4th 459, 466 (6th Cir. 2022). Regardless, to whatever extent the Sixth Circuit interprets *Davis* differently, the Court adopts the analysis set forth above.

Finally, the University also differentiates the facts in this case from those in which a "made vulnerable" theory was allowed and compares it to cases in which the evidence was found insufficient. In doing so, the University extolls the actions that it took. However, as discussed earlier, a jury might conclude that Defendant was deliberately indifferent in several respects. For example, Defendant assumed the role of Complainant after failing to afford Plaintiffs the opportunity promised them in the school's policies to participate in the process as the Complainant. In fact, a jury might find that Defendant actively discouraged or prevented Plaintiffs from acting as the Complainant. This unnecessarily led Defendant into a conflict between its role as the presenter of the case and its perceived need to "remain neutral." Worse, there is evidence that might cause the jury to believe Defendant did not "remain neutral" but actually collaborated with and helped T.P. in numerous respects. Because of these actions (particularly those that resulted in Plaintiffs not presenting evidence to the hearing panel) Plaintiffs' claims were not substantiated and resulted in a finding that T.P. had not sexually assaulted Doe 2. Plaintiffs were unable to appeal the adverse ruling because Defendant was deliberately indifferent (if not opposed or hostile) to Plaintiffs' right to participate in and present evidence at the hearing. Then, because of the favorable ruling at the hearing and Defendant's seeming favoritism toward him, T.P. felt

emboldened to contact Doe 2 on several occasions and to make public comments complaining about the accusations and accusing Doe 2 and others (albeit not by name) of slandering him. The jury may conclude that this sequence of events exemplified Defendant's deliberate indifference and left Doe 2 vulnerable to further harassment by T.P. and led to her decision to enroll at a different school.

However, the evidence that Defendant's actions made either Plaintiff vulnerable to future harassment is limited to Doe 2. The Record does not contain evidence that Defendant's actions made Doe 1 more vulnerable. Doe 1 reported T.P.'s conduct to Defendant in September 2017 but at the same time stated that she considered the matter to have been resolved. Thereafter, she completed the semester, and while she left the University before the following semester started, the University's alleged deliberate indifference had not yet occurred. Thus, Doe 1 is similar to the plaintiff in *K.T.*, in that her lack of a connection to the school after January 2018 prevents her from demonstrating that the University's deliberate indifference (1) made her vulnerable to T.P.'s future harassment or (2) subjected her to discrimination under an educational program or activity.

For these reasons, Doe 2 can proceed on her claim that the University's deliberate indifference during the Title IX process made her vulnerable to subsequent harassment from T.P. Summary judgment is granted to the University on all other aspects of Count I.

### ii. Whether *Gebser* and *Davis* Apply to All Claims Under Title IX (Counts II, III, and V)

The University contends that all claims under Title IX fall under the framework adopted by the Supreme Court in *Davis* and *Gebser*, meaning that Plaintiffs must prove that the University had actual notice of a specific instance of sexual misconduct and was deliberately indifferent in its response to that violation to recover on their erroneous-outcome and official-policy claims. *See Gebser*, 524 U.S. at 290. Plaintiffs respond that the *Gebser* standard applies only where liability

Case 2:19-cv-04229-NKL   Document 208   Filed 08/30/22   Page 39 of 59

arises from the sexual misconduct of a third party—such as another student, as is the case with Count 1—and not where the University directly violated Title IX through its actions.

The Supreme Court has, from the beginning, established two distinct avenues to hold a covered entity liable under Title IX:  first, liability may stem from a covered entity's official actions and policies, and second, liability may stem from deliberate indifference to student-on-student or teacher-on-student harassment or assault.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("[P]rivate parties [may] seek monetary damages for intentional violations of Title IX.  We have also held that the private right of action encompasses intentional sex discrimination in the form of a recipient's deliberate indifference to a teacher's sexual harassment of a student or to sexual harassment of a student by another student." (citing *Franklin,* 503 U.S. at 60; *Gebser,* 524 U.S. at 290–291; *Davis,* 526 U.S. at 642).  While the deliberate indifference standard is meant to mirror the notice required by Title IX's administrative enforcement process, that notice is not required "when the funding recipient engages in intentional conduct that violates the clear terms of [Title IX]."  *Davis*, 526 U.S. at 642–643; *see also id.* at 644 ("*If a funding recipient does not engage in harassment directly*, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment." (emphasis added)); *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020) (finding that, when a university policy violates Title IX, a "school need not have had actual knowledge of a specific instance of sexual misconduct or responded with deliberate indifference to that misconduct before damages liability may attach").  Thus, while a covered entity's deliberate indifference in the face of actual notice of third-party discrimination is *one* way in which a covered entity may intentionally violate the statute, *Franklin*, 503 U.S. at 75, it is not the only actionable manifestation of sex discrimination by a covered entity.

To support its assertion that *all* damages claims under Title IX fall under the *Gebser/Davis* framework, the University argues that *Grandson v. University of Minn.*, 272 F.3d 568, 575 (8th Cir. 2001), is an explicit direction from the Eighth Circuit to apply the deliberate indifference standard to all cases, even those based on a university's own official actions. Indeed, at least one district court in the Eighth Circuit has adopted this view. *See Ezell v. Fayetteville Pub. Sch.,* 2015 WL 8784431, at *6 (W.D. Ark. Dec. 15, 2015) (requiring a plaintiff to plead actual notice of a Title IX violation and deliberate indifference, as required by *Gebser*, to state a claim challenging a high school's disparate treatment of baseball and softball teams).[10] This Court does not read *Grandson* so broadly. Based on the case itself, subsequent Eighth Circuit decisions, persuasive precedent from other Circuits (some of which directly interpret *Grandson*), and later developments in the Supreme Court, the Court concludes that *Grandson* does not require the application of *Gebser*'s deliberate indifference standard to claims challenging the official policy or action of a covered entity.

First, the question of whether the deliberate indifference standard applied was not at issue in *Grandson*. The Eighth Circuit seems to have assumed, without analyzing or explicitly deciding, that *Gebser's* deliberate indifference standard would apply to a covered entity's funding decisions. *Grandson*, 272 F.3d at 575. The plaintiffs in *Grandson* did not argue otherwise. *Id.* The Court therefore does not construe *Grandson*'s silence as a holding that such a standard must be universally applied.

---

[10] The University also argues that *Portz v. St. Cloud State University*, 297 F. Supp. 3d 929, 940 (D. Minn. 2018), held that "Title IX damage actions which do not involve an institution's official policy require a showing of deliberate indifference." However, *Portz* held only that "athletic and scholarship offerings" of the type that were at issue there did not constitute "an official policy exempted from the *Gebser* analysis." *Id.* at 940. Indeed, the *Portz* court expressly stated that it "need not decide whether *Grandson* applies to all Title IX claims." *Id.* at 941. *Portz* thus does not support the University's argument that *Gebser/Davis* apply to all Title IX claims.

The fact that the Eighth Circuit has never cited to *Grandson* for the proposition that *Gebser* and *Davis* control in all actions for damages under Title IX further substantiates this conclusion. Indeed, subsequent Eighth Circuit cases suggest the contrary. *See Pearson v. Logan Univ.*, 937 F.3d 1119, 1124 (8th Cir. 2019) ("To succeed on a Title IX claim *based on harassment by another student*, a plaintiff must show that the educational institution was '(1) deliberately indifferent (2) to known acts of discrimination (3) which occur[red] under its control.'") (citation omitted) (emphasis added)); *K.T.*, 865 F.3d at 1057 (highlighting that when a Title IX claim is based on student-on-student harassment, the *Davis/Gebser* standard applies); *Roe*, 746 F.3d at 882 (reiterating that the deliberate indifference standard applies in cases "which do not involve an institution's official policy"). Indeed, in 2020, the Eighth Circuit recognized erroneous-outcome theories under Title IX without tying recovery to the *Davis/Gebser* framework. *See Rossley v. Drake Univ.*, 979 F.3d 1184, 1192 (8th Cir. 2020), *cert. denied*, 141 S. Ct. 1692 (2021); *Doe v. Univ. of Ark.-Fayetteville,* 974 F.3d 858, 864 (8th Cir. 2020).

Second, outside the Eighth Circuit, several federal appellate courts have explicitly concluded that the deliberate indifference standard does not always apply. *E.g., Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 965 (6th Cir. 2020) ("The statute covers a school that 'subject[s]' students to sex-based 'discrimination' in at least two ways. A school might directly interfere with a student's participation in an education program on the basis of sex. Or it might indirectly do the same thing by being 'deliberately indifferent to known acts of student-on-student sexual harassment.'" (citation omitted)); *Simpson v. Univ. of Col. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) ("We conclude that a funding recipient can be said to have 'intentionally acted in clear violation of Title IX,' when the violation is caused by official policy[.]") (internal citation omitted).

Further, courts have endorsed theories very similar to that which Plaintiffs espouse here pertaining to the University's policy of remaining neutral during Title IX proceedings. *See Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 779 (W.D. Tex. 2018) (finding that plaintiffs successfully stated a claim challenging a defendant's official policy); *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 806 (M.D. Tenn. 2016) (highlighting two theories of recovery under Title IX: first, deliberate indifference in response to knowledge of sexual assault, and second, official policies that themselves "rendered plaintiffs vulnerable to assault").

Moreover, Supreme Court decisions subsequent to the Eighth Circuit's decision in *Grandson* indicate that deliberate indifference is not always required. In *Jackson*, the Supreme Court held that retaliation for reporting sex discrimination is a form of intentional sex discrimination under Title IX that does not require application of the deliberate indifference standard because retaliation, by definition, is an intentional act that subjects the complainant to differential treatment on the basis of the subject of the complaint—sex. *Jackson*, 544 U.S. at 173–74 ("We therefore conclude that retaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of the statute,' . . . and that Title IX itself therefore supplied sufficient notice to the Board that it could not retaliate against Jackson after he complained of discrimination against the girls' basketball team." (citation omitted)).

Finally, the Supreme Court has specified that Title IX should be construed broadly. *Id.* at 175 ("'Discrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach." (citing *North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982) ("Courts 'must accord' Title IX 'a sweep as broad as its language.'"))).

For these reasons, the Court concludes that the *Gebser/Davis* framework applies only to cases seeking to hold covered entities responsible in connection with the misconduct of third parties, and therefore does not apply to the erroneous-outcome and official-policy claims in Counts II, III, and V, which turn on official University actions and policies.[11]

### iii. Count 2 - Whether Plaintiffs Have Presented a Submissible Case Under an Erroneous Outcome Theory

#### a. Whether a Victim May Bring an Erroneous Outcome Claim

In Count 2, Plaintiffs seek to bring an erroneous outcome claim. The Eighth Circuit has recognized that such a claim can be pursued under Title IX by a male accused of sexual harassment who claims he was disciplined because of his sex, not because of the merits of claim against him. *See Doe v. University of Arkansas-Fayetteville,* 974 F. 3d 858 (8th Cir. 2020). The University argues that *only* an alleged perpetrator may bring an erroneous outcome claim. *See* Doc. 105, at 44 (citing *Univ. of Ark.*, 974 F.3d at 864). Plaintiffs respond that neither the Eighth Circuit nor any court in the Eighth Circuit has explicitly limited erroneous outcome claims to perpetrators found responsible in Title IX proceedings. They argue that even if the theory has been used mostly by perpetrators, it does not follow that victims are foreclosed from invoking it.

Although, typically, the plaintiff who brings an erroneous outcome claim is an individual found responsible during a university's Title IX process, the Eighth Circuit has never—directly or indirectly—limited erroneous outcome claims to use by alleged perpetrators.[12] The Eighth Circuit simply has never addressed the question. There is language in *Rossley*, and indeed in most

---

[11] In any event, even if the *Gebser/Davis* framework applied, the Court would find it satisfied in this case, as the Court's discussion of Plaintiffs' deliberate indifference claim in the context of the investigation and disciplinary proceedings following Plaintiffs' reports above demonstrates.

[12] The additional cases cited by the University in its Motion to Dismiss (Doc. 84, pp. 10–11) and Motion for Summary Judgment (Doc. 105, p. 44) do not limit erroneous outcome claims to alleged perpetrators.

erroneous outcome cases, that identifies the plaintiff as a male and the respondent in an underlying Title IX proceeding. But, in those cases, the plaintiffs just happened to be both – there was no statement that it was a legal requirement that they be both.

Only two other courts appear to have directly addressed the question of whether an alleged victim may bring an erroneous-outcome claim, and they reached opposite conclusions. First, in *Borkowski v. Balt. Cnty., Md.*, the district court rejected the plaintiffs' attempts to invoke the erroneous-outcome doctrine where they alleged that the university's Title IX process was biased in favor of the perpetrator. 492 F. Supp. 3d 454, 489 (D. Md. 2020). However, it did so without much analysis of Title IX itself, focusing instead on the fact that the cases cited by the plaintiffs each involved erroneous-outcome claims brought by an alleged perpetrator. *Id.* The district court found this to be dispositive, and held that erroneous-outcome claims exist to vindicate only the rights of "a person who is improperly disciplined by the university." *Id.*

In contrast, in *Doe v. Bd. Of Regents of Univ. Wisconsin*, the district court rejected the defendant university's contention that, because most erroneous outcome claims were brought by perpetrators, victims could not bring them. 2021 WL 5114371, at *4 (W.D. Wis. Nov. 3, 2021). The district court found *Borkowski* unpersuasive because it "failed to articulate any explanation for its holding, other than simply making an *observation* about the nature of a plaintiff in a typical erroneous outcome claim . . . ." *Id.* (emphasis in original). The *Univ. of Wisconsin* court also saw nothing in the cases establishing and adopting the erroneous-outcome theory that limited the right to bring such a claim to alleged perpetrators. Citing the text of Title IX, the *Univ. of Wisconsin* court held that a plaintiff, whether the alleged perpetrator or victim, must prove only that "gender bias was a motivating factor behind the erroneous finding." *Id.*

Since Plaintiffs first filed this case, the Eighth Circuit has held that Title IX cases concerning the disciplinary process do not depend on any particular doctrinal test. *Rossley*, 979 F.3d at 1192. Rather, because "a university's sexual misconduct disciplinary procedures must protect the interests of a student victim of sexual assault as well as those of a student accused of sexual assault," *Shank*, 993 F.3d at 576 (citing *Univ. of Ark.*, 974 F.3d at 868), the fundamental question under Title IX is always (and only) whether the facts "raise a plausible inference that the university discriminated against the plaintiff on the basis of sex." *Rossley*, 979 F.3d at 1192.

Given the Supreme Court's pronouncement that Title IX is to have "broad reach," *Jackson*, 544 U.S. at 173–74, and in light of the Eighth Circuit's direction to test any theory under Title IX for sex discrimination, rather than whether it fits squarely within any doctrinal test, *Rossley*, 979 F.3d at 1192, the Court concludes that victims of sex discrimination may challenge a university's actions during the disciplinary process based on an erroneous-outcome theory. It would be counter intuitive to find that the very program utilized by a University to address sexual harassment claims in educational institutions could itself be used to discriminate against either the accused or the accuser based on their gender.

### b. Whether Plaintiffs Have Adduced Sufficient Evidence to Support an Erroneous-Outcome Claim

To survive summary judgment on a Title IX claim under an erroneous-outcome theory, a plaintiff must adduce evidence that during the University's investigation and resolution of a complaint of sexual harassment, the University discriminated against the plaintiff because of their sex. This standard reflects the approach taken by several circuit courts that have addressed erroneous outcome claims raised by men accused of sexual harassment, *Doe v. University of Arkansas-Fayetteville,* 974 F. 3d 858 (8th Cir. 2020); *Doe v. Univ. of the Sciences,* 961 F.3d 203, 209 (3d Cir. 2020); *Sheppard v. Visitors of Va. State Univ.,* 993 F.3d 230, 236 (4th Cir. 2021);

*Doe v. Univ. of Ark. - Fayetteville,* 974 F.3d 858, 864-65 (8th Cir. 2020); *Schwake v. Ariz. Bd. of Regents,* 967 F.3d 940, 947 (9th Cir. 2020); *see also Doe v. Univ. of Denver,* 1 F.4th 822, 830 (10th Cir. 2021), and the Court finds it equally applicable to the claim in this case.

Considering all the evidence in the record, the Court finds that a reasonable juror could conclude that the University discriminated against Plaintiffs because of their sex during its investigation and resolution of the Plaintiffs' complaints of sexual harassment.

"A decision that is against the substantial weight of the evidence and inconsistent with ordinary practice...may give rise to an inference of bias, although not necessarily bias based on sex." *Doe v. University of Arkansas-Fayetteville,* 974 F. 3d 858, 865 (8th Cir. 2020). A jury could readily conclude that T.P.'s violations were far more extensive than were found by the hearing panels. A jury could also find that those erroneous outcomes were the product of the procedural abnormalities discussed above. Those procedural abnormalities are not merely isolated incidents or common human error, but instead could be found to form a pattern of decision-making related to Plaintiffs' complaints about T.P. that is "so different from what could be expected," the pattern itself can give rise to an inference of sex discrimination. *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995) (holding that, in the Title VII context, if a plaintiff's treatment is "'so different from what could be expected' it may give rise to an inference of gender discrimination" (citation omitted);[13] *see also Columbia Univ.*, 831 F.3d at 56–57 (finding that inference of sex discrimination supported by fact that "[b]oth the investigator and the panel declined to seek out potential witnesses Plaintiff had identified as sources of information favorable

---

[13] The Court's analysis under Title IX may be informed by Title VII jurisprudence. *See, e.g.*, *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2008) ("Generally, the courts have looked to Title VII as an analog for the legal standards in both Title IX discrimination and retaliation claims."); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (noting that "courts have interpreted Title IX by looking to . . . the caselaw interpreting Title VII").

to him"; "[t]he investigator and the panel failed to act in accordance with University procedures designed to protect" people in plaintiff's situation; and "[t]he investigator, the panel, and the reviewing Dean, furthermore, reached conclusions that were incorrect and contrary to the weight of the evidence"); *Macone v. Town of Wakefield*, 277 F.3d 1, 6 (1st Cir. 2002) (explaining that procedural abnormalities can provide a basis for finding discriminatory intent in Fair Housing Act and § 1983 case) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.")); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (finding, in a case premised on federal employment statutes, that "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's actions can defeat a claim of pretext and support discriminatory intent under Title VII).

In *Columbia*, the Second Circuit recognized that allegations of shoddy investigation and erroneous outcome by themselves did "not necessarily relate to bias on account of sex." However, additional factual allegations suggesting that the university was motivated to show that it took sexual misconduct allegations seriously "g[a]ve ample plausible support to a bias with respect to sex." In contrast, here there are factual allegations suggesting that the University was motivated to diminish Plaintiffs' (and the others victims') complaints about T.P. Those facts include the University's failure to initiate formal investigatory and disciplinary proceedings when it first received complaints about T.P.; a finding adverse to T.P. on a subsequent charge of Doe 1 or 2 would cast the University's prior limited action in the face of two serious complaints into question. *Compare, Univ. of Ark.*, 974 F.3d at 865 ("External pressure on a university to demonstrate that it acted vigorously in response to complaints by female students may support an inference that a university is biased based on sex, although not necessarily in a particular case."). And

significantly, the University offers no plausible explanation for its unusual actions which in part violated its own rules. When conduct is completely unexplainable, "it is more likely than not [that the party accused of discrimination], who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as [sex]." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 (1978) (emphasis in original); *see also Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 801 (8th Cir. 1994) ("[E]vidence that an employer's proffered nondiscriminatory explanation is wholly without merit or obviously contrived might serve double duty; it might serve the additional purpose of permitting an inference that . . . discrimination was a motivating factor in a plaintiff's termination"). Plaintiffs have presented sufficient evidence for this issue to reach a jury on the question of whether the University discriminated against the Does, based on their sex.

Because evidence—and inferences drawn from that evidence—could support a jury's determination that the University's Title IX process was tilted in T.P.'s favor in such a way that there is an articulable doubt as to the outcome and that the process was infected with sex discrimination, the University is not entitled to summary judgment on Count II.

### iv.    Whether Count III Survives Summary Judgment

In their response to the University's Motion for Summary Judgment, Plaintiffs describe Count III as a facial challenge to the University's policy of remaining neutral when it is the Complainant, alleging that the policy "clearly subjected the female Victims to discrimination throughout the course of their Title IX hearings" and depriving them of various rights afforded to respondents during the Title IX process. Doc. 121, at 61. In contrast, later in that same discussion, Plaintiffs focus on the facts of their particular cases, particularly the University's unilateral decision to be the Complainant. *Id*. However, the remain neutral policy is not mentioned in Count

III; in fact, the only mention of policies is in paragraph 136, which actually complains about the lack of "proper or adequate procedures to discover, prohibit or remedy the kind of discrimination that Plaintiffs suffered." In contrast, most of Count III's allegations discuss the University's response to Plaintiffs' complaints and how it compared to the University's treatment of T.P. Doc. 75, ¶¶ 132, 135, 137-42. The Court thus concludes that Count III is not a facial attack on the University's "remain neutral" policy. Instead, Count III is better understood as an "as-applied challenge" alleging that the University treated Plaintiffs differently than it treated T.P. (in that the University did not follow the CRRs as they related to the treatment of Plaintiffs and their rights to participate in the Title IX process) because of their gender.

With that understanding, the University's request for summary judgment on Count III is denied. For the reasons previously discussed, there is abundant evidence in the Record that would permit a jury to find that Plaintiffs' rights and opportunities were denied, thwarted, or discouraged, while T.P.'s rights were scrupulously honored. There is also evidence that would permit the jury to find that this differing treatment was based on Plaintiffs' gender. Therefore, the University is not entitled to judgment as a matter of law on Count III.[14]

### c. Whether Count V Survives Summary Judgment

Plaintiffs argue in Count V that the University's policy of remaining neutral when it is the Complainant heightened the risk that they would be subjected to sex discrimination. (Doc. 121, p. 63.) The parties did not, and the Court could not, identify any case in or before the Eighth Circuit that addressed heightened risk claims. However, in *Karasek*, 956 F.3d at 1112, the Ninth

---

[14] Understood this way, and given that the Eighth Circuit has rejected the practice of creating distinct categories or types of Title IX claims, *see Rossley*, 979 F.3d at 1192, it may be that Counts II and III are redundant. But even if they are that is not a reason to grant summary judgment on either of them.

Circuit established a framework for analyzing such claims. As the Eighth Circuit has not set forth a test for such claims, the Court applies the Ninth Circuit's framework to assess Plaintiffs' claims.

To succeed on a heightened-risk claim, a plaintiff must show "(1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was 'so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school.'" *Karasek*, 956 F.3d at 1112.[15]

The second requirement is fatal here. Even assuming that the remain-neutral policy alone is evidence of deliberate indifference to reports of sexual misconduct, Plaintiffs have failed to produce any evidence—controverted or otherwise—from which a reasonable jury could conclude that the remain neutral policy alone led to a generalized increased risk of sexual harassment or assault. Plaintiffs argue that the University's policy of remaining neutral lowers the odds that a respondent will be found responsible during a Title IX hearing. However, the record does not support that assertion. Plaintiffs point to the fact that, during the 2017-2018 school year, 11 of 750 Title IX complaints resulted in a "responsible" finding, Doc. 121, at 50 ¶ 134–35, but this fact paints an incomplete picture. While the Record shows that, during that school year, 11 respondents were found responsible after a Title IX hearing, it also shows that only 15 cases were put before "a hearing panel or administrator." Doc. 121, at 50 ¶¶ 134–35.[16] The record shows that the

---

[15] While this standard looks for deliberate indifference, it is notably different from the *Davis*/*Gebser* framework. As discussed above, the actual-notice requirement imposed by the Supreme Court in *Gebser/Davis* does not apply to Count V. The question for a challenge to an official policy is whether the University was deliberately indifferent to notice of sexual misconduct generally, not specific incidents.

[16] The University challenges the admissibility of these statistics. The Court believes that the University's Title IX statistics *could* be presented in an admissible format. Indeed, much of the same data—if not all of it—is in the Title

University's policy was to remain neutral in all those cases. Doc. 122-15, at 48:20–25 (Doc. 122-15). Even then, 73.3% of the respondents were found responsible. These statistics alone would prevent a reasonable juror from finding that the remain-neutral policy had an adverse impact on Title IX hearing outcomes generally.[17]

Plaintiffs cite to additional facts relating to the total number of Title IX reports (approximately 750 in the 2017-2018 school year) and the number of reports actually investigated (46), but they have presented no evidence that these numbers are attributable to the University's remain-neutral policy.

Given the lack of evidence that the remain-neutral policy has impacted the number of Title IX reports filed or number of investigations undertaken, the University is entitled to summary judgment on Count V.

### B. Whether the University Is Liable for Alleged Contractual Violations (Count IV)

To prove breach of contract under Missouri law, a plaintiff must establish 1) the existence of a valid contract; 2) the rights of plaintiff and obligations of defendant under the contract; 3) a breach by defendant; and 4) damages resulting from the breach. *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 4 (Mo. Ct. App. 2013). Plaintiffs' contract claim is premised on what they argue was the breach by the University of several of its own policies in its response to the Plaintiffs'

---

IX Office's Annual Reports, publicly available on its website. *See* Office for Institutional Equity, *Reports & Data*, available at https://equity.missouri.edu/reports-data/.

[17] Count V also alleges that the University has adopted the practice of "unilaterally assuming the status of complainant from certain victims, including but not limited to Plaintiffs. In doing so, the University (1) failed to notify the victims that they were no longer the complainant and (2) failed to inform them of the rights they had lost." (Doc. 75, ¶ 163.) However, there is no evidence in the Record to support this allegation, and Plaintiffs do not rely it in opposing summary judgment on Count V. (Doc. 121, pp. 63-64.) The Court thus understands Count V to be addressing the CRRs as written and specifically their provisions for the University to remain neutral when it assumes the role of Complainant because the victim does not wish to proceed, and does not address the University's alleged (but not substantiated) unwritten practice of not following the CRRs.

Title IX complaints.[18] The University of Missouri has taken the position that it is not required to follow its own policies and can revoke them at any time, even retroactively. In addition, the University of Missouri argues its policies are merely aspirational and cannot be legally enforced against them because they are not specific.

To state a claim for breach of contract in this context, Plaintiffs must cite to provisions of the CRRs that create specific, discrete obligations or promises that the University owes to Plaintiffs. *Gillis v. Principia Corp.*, 832 F.3d 865, 874 (8th Cir. 2016) (citing *Lucero*, 400 S.W.3d at 7). Such promises may come from "an educational institution's brochures, policy manuals and other advertisements," but "not every dispute between a student and a university is amenable to a breach of contract claim." *Lucero*, 400 S.W.3d at 5. Provisions that provide general guidance or that state aspirational goals or principles cannot form the basis of a breach of contract claim against a school. *See Gillis*, 832 F.3d at 873–74 (finding a school's dispute resolution policy, which required the injured party to first attempt to resolve the conflict with the injuring party privately, was insufficiently specific to state a contractual claim because it set forth aspirational guiding principles, rather than promises or obligations). Policies that use permissive language, such as "can" or "may," are similarly not enough to maintain a breach of contract claim. *See Doe v. Washington Univ.*, 2021 WL 4504387, at *6 (E.D. Mo. Sept. 30, 2021) (finding a policy that read,

---

[18] The University argues that *Lucero* holds that Missouri law does not recognize contract claims between a university and a student. However, while *Lucero* observed that Missouri courts had not "expressly" found a contractual relationship between a university and student, outside of a specific written agreement calling for a reduction in tuition, it does not hold that a university's policy can *never* constitute an enforceable promise. To the contrary, after considering the circumstances in which courts in other states have found that educational policies "form the basis of a legally cognizable contractual relationship between the institution and its students," *Lucero* states that, "in order to assert a breach of contract claim against a university, a student plaintiff must 'point to an identifiable contractual promise that the [university] defendant failed to honor.'" *Lucero*, 400 S.W.3d at 5 (quoting *Bittle v. Oklahoma City Univ.*, 6 P.3d 509, 514 (Okla. Ct. App .2000)); *Miller v. Loyola Univ. of New Orleans,* 829 So.2d 1057, 1060 (La. Ct. App. 2002); *Ross v. Creighton Univ.,* 957 F.2d 410, 416–17 (7th Cir. 1992)). Although the CRR provisions at issue in *Lucero* could not constitute the basis of a contract claim because they were "aspirational in nature" and "general," *Lucero* left open the possibility that specific promises contained in other CRR provisions could be enforceable.

"if a student meets the degree requirements, they can receive a degree," to be insufficient to state a claim because it merely provided the defendant university with the authority, but not an obligation, to confer a degree after completion of degree requirements).

Plaintiffs first point to the University's general non-discrimination policy (CRR 600.020)[19] and the policy governing the Title IX Office (CRR 600.020(E))[20] to support their claim. Doc. 75 ¶¶ 150, 152. Plaintiffs argue that the University violated its CRR prohibiting sex discrimination by "neglecting to properly investigate and remedy the many claims of sexual harassment and assault by [T.P.]." Doc. 75, ¶ 151. The University argues that these provisions cannot support a contractual cause of action because they are general statements of policy, not enforceable contractual promises, and the Court agrees. These provisions of CRR 600.020 cannot be read as a concrete promise or a specific obligation because they contain no requirements for the University's response to any allegations of sex discrimination. They simply explain that sex discrimination is prohibited. Indeed, there is no mention of the investigation into or response to sex discrimination

Plaintiffs also argue that they may maintain a contract action because the University unilaterally decided to take make itself the Complainant in Plaintiffs' stead. The Court agrees that

---

[19] "In furtherance of these commitments, both University policy and applicable state and federal law, [*sic*] prohibit all students, employees, volunteers and visitors at the University from engaging in discrimination on the basis of any protected characteristic, including sex, pregnancy, gender identity, and gender expression. In addition, University policy and the law prohibit sexual misconduct, sexual harassment, stalking on the basis of sex, dating/intimate partner violence, and sexual exploitation, as defined in Section 600.020.B. As used in this policy, the word 'sex' is also inclusive of the term 'gender.'"

[20] "The Title IX Coordinator should evaluate the Complainant's request in the context of providing a safe and nondiscriminatory environment for the University community. . . . If, after due deliberation and based on the nature and severity of the Complaint, the Title IX Coordinator determines there is a sufficient basis to proceed with the Complaint, the Title IX Coordinator may initiate an investigation notwithstanding a Complainant's request that the Complaint not be pursued. Such a decision should be well-reasoned and documented. Documentation of the decision will be maintained by the Title IX Coordinator. In such cases, the Title IX Coordinator will inform the Complainant of the decision to commence an investigation." Doc. 105-1, p. 10.

the applicable provisions of CRR 600.020(E) and CRR 600.030(C)(2)[21] are sufficiently specific to permit this claim.

Plaintiffs were "Complainants" because they were students reporting that they were the victims of "discrimination, harassment or sexual misconduct," CRR 600.030(C)(2), and both CRR 600.020 and CRR 600.030 provide that they were to remain the "Complainant" unless they explicitly expressed that they did not wish to be the Complainant. The CRRs (particularly CRR 600.030) set forth specific rights, opportunities, and protections afforded to the Complainant – rights, opportunities, and protections that the victim surrenders or loses if choose not to be the Complainant. The promise that a victim shall have certain rights, opportunities or protections unless he or she rejects them is sufficiently definite to create contractual obligations.

For instance, CRR 600.030, Section H, lists, *inter alia*, the following "Rights of the Complainant in the Equity Resolution Process":[22]

6. To have an Advisor of the Complainant's choice accompany the Complainant to all interviews, meetings and proceedings throughout the Equity Resolution Process.

. . .

14. To have an opportunity to appeal the findings and sanctions.

15. Additional Rights For Hearing Panel Resolution:

a. To receive notice of a hearing.

---

[21] Although the University argued that Plaintiffs did not plead violations of CRR 600.030, that is not the case. Plaintiffs expressly mentioned CRR 600.030 at least twice in pleading the breach of contract claim. *See* Doc. 75 (Second Amended Complaint), ¶¶ 155-156. They also alleged that "[t]he University breached a multitude of its obligations to Doe 1 and Doe 2 under the University's Policy," of which CRR 600.020 was merely an "example . . . ." *Id.*, ¶ 150. Further, the entirety of Section 600.030 is attached to the Second Amended Complaint, *See* Doc. 75-1, p. 8, and was therefore incorporated therein. *See, e.g., Meardon v. Reg.*, 994 F.3d 927, 934 (8th Cir. 2021) (noting that in assessing sufficiency of pleadings, the court considers "the complaint and materials that are 'necessarily embraced by the pleadings and exhibits attached to the complaint'"). Thus, Plaintiffs adequately pleaded breach of contract based on CRR 600.030.

[22] Further, the tenth "Right" is the right "[t]o have Complaints heard in substantial accordance with these procedures."

. . .

c. To be present at the hearing, which right may be waived by either written notification to the Hearing Panel Chair or by failure to appear.

. . .

e. To have present an Advisor during the hearing and to consult with such Advisor during the hearing.

. . .

g. To present witnesses and documents deemed relevant by the Chair.

h. To question witnesses [who are] present and testifying at the hearing.

Doc. 106, pp. 4-5. Other rights bestowed on the Complainant include the right to have an advisor in the hearing room, (CRR 600.030(J)), call witnesses (CRR 600.030(P)(4)), present evidence and argument, (CRR 600.030(P)(6) and (8)), and appeal the decision, (CRR 600.030(S)).

There is sufficient evidence in the record for a reasonable factfinder to conclude that neither Plaintiff indicated that she no longer wanted to be the Complainant, that the University unilaterally assumed the role of Complainant, and that because it assumed the role of Complainant the University stripped Plaintiffs of each of these enumerated rights. Neither was allowed to have an advisor in the hearing, let alone to consult with one; each was told that, except while giving her own testimony, she could *not* be present at the hearing; neither was permitted an opportunity to present witnesses or documents; and neither had an opportunity to appeal the decisions of the hearing panels. Doe 1 also did not receive notice of the hearing.

In addition, CRR 600.030(N)(4) provides that the Respondent is not permitted to question the Complainant unless she agrees. *Id.*, p. 8. Here, however, Plaintiffs were told that T.P. would be allowed to question them directly at the hearings. Further, except where an accelerated resolution process is scheduled with the parties' consent—a situation that did not present itself

here—the "Parties" were supposed to receive "[a]t least fourteen (14) business days" of notice of the hearing (P.3). *Id.*, p. 10. Plaintiffs received, at most, three days' notice of the hearings.

In short, CRR 600.030 imposed multiple obligations and duties on the University in favor of the Complainant. *Cf., e.g., Reed v. Curators of Univ. of Missouri*, 509 S.W.3d 816, 826 (Mo. Ct. App. 2016) (finding no enforceable promise where "[t]he policy language did not expose Ms. Reed to any legal duties or liabilities"). The aforementioned provisions are not aspirational or vague; they are concrete, mandatory, and unmistakable. *Cf. Lucero*, 400 S.W.3d at 5–6 (holding that such language as "[t]he University of Missouri is committed to providing a positive work and learning environment," "a goal to which every member of the university community should aspire," and "it is the university's special responsibility to provide a positive climate" were "aspirational" and "general"); *Gillis*, 832 F.3d at 873–74 (finding that dispute resolution policy that set forth aspirational guiding principles, rather than promises or obligations, could not form the basis for contract claim). As such, the promises in CRR 600.030 discussed above, which a reasonable factfinder could find the University breached, can constitute the basis of a claim for breach of contract.

The University's final argument against the breach of contract claim is that the policies are not enforceable because the University can unilaterally modify them, even retroactively. The University points to the following Missouri statute, which confers rulemaking authority on the University's curators:

> The curators shall have power to make such bylaws or ordinances, rules and regulations as they may judge most expedient for the accomplishment of the trust reposed in them, and for the government of their officers and employees, and to secure their accountability, and to delegate so much of their authority as they may deem necessary to such officers and employees or to committees appointed by the board.

Mo. Rev. Stat. § 172.100. The University argues that the curators are thus statutorily authorized to make, may be amended at any time, and therefore, any promise in the CRR is illusory. *See Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776 (Mo. 2014) ("A promise is illusory when one party retains the unilateral right to amend the agreement and avoid its obligations.").

Nothing in the statute, or the limited case law citing the statute, suggests that the curators are authorized to retroactively alter promises made to students in order to avoid the University's obligations – much less that they can alter them in the middle of what would be the contract's "performance" (i.e., after a student has made a complaint of discrimination or harassment and thereby becomes the Complainant).[23] To the contrary, the statute imposes an important limitation on the curators' ability to make rules: it requires a judgment by the Curators that the rules be "most expedient for the accomplishment of the trust reposed in them" and "to secure the[] accountability" of "their officers and employees . . . ." Mo Rev. Stat. § 172.100. Changing the promises in CRR 600.030 *retroactively* – and in a pending matter – as the University suggests it could, would neither be consistent with the trust reposed in the institution nor secure the accountability of its employees. By the terms of the statute, then, such a modification would be outside of the curators' authority.

As the statute does not vest the Curators with the authority to unilaterally and retroactively modify the promises at issue, which it already made and on which Plaintiffs arguably relied, the promises are not illusory. The Court rejects the University's argument to the contrary.

---

[23] The published cases citing Mo Rev. Stat. § 172.100 do not consider whether it permits the University to unilaterally and retroactively change promises it has made. *See State ex rel. Schmitt v. Choi*, 627 S.W.3d 1, 13 (Mo. Ct. App. 2021) (citing the statute in explaining that university rules are analyzed in the same way as state laws and regulations); *Trib. Pub. Co. v. Curators of Univ. of Missouri*, 661 S.W.2d 575, 579 (Mo. Ct. App. 1983) (examining the statute to determine what "the governing body or governing authority of the University" was). The statute was cited in a third case by the Missouri Court of Appeals to support the proposition that "the Board of Curators of Lincoln University has rule making authority and is a state agency." That decision was transferred to the Missouri Supreme Court, which did not cite the statute in reaching the same conclusion. *Byrd v. Bd. of Curators of Lincoln Univ.*, 1992 WL 378663 (Mo. Ct. App. Dec. 22, 1992), *opinion on transfer*, 863 S.W.2d 873 (Mo. 1993) (en banc).

58

## IV. CONCLUSION

For the reasons discussed above, the University's motion for summary judgment (Doc. 104) is GRANTED with respect to Count I, insofar as it concerns (1) the University's conduct prior to Doe 1's report of sexual misconduct, and (2) all claims asserted by Doe 1. The motion is also GRANTED with respect to Count V in full. The Court DENIES the University's motion for summary judgment as to Count I insofar as it alleges deliberate indifference following Doe 2's reports of T.P.'s sexual misconduct, and as to Counts II, III and IV in their entirety.

 s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  August 30, 2022
Jefferson City, Missouri